OPINION
In this expedited case the State of Ohio appeals from an order suppressing evidence. The State argues that the trial court erred in holding that the crack cocaine seized by police was obtained as the result of an unlawful search and seizure. For the reasons set forth below we agree, and accordingly will reverse the judgment of the trial court and remand this case for further proceedings., Defendant, Richie Wagoner, was indicted on one count of possessing crack cocaine. R.C. 2925.11(A). Prior to trial, Wagoner filed a motion to suppress evidence. He claimed that police lacked the reasonable suspicion of criminal activity necessary to justify stopping the truck in which Wagoner was a passenger and from which the evidence was seized. Following an evidentiary hearing the trial court granted Wagoner's motion to suppress evidence. The State timely appealed from the judgment of the trial court suppressing the evidence in this case pursuant to R.C. 2945.67 and Crim.R. 12(J).
The evidence presented at the suppression hearing demonstrates that for the past one and one-half years Dayton police officer Robert Rike has worked for the Dayton Metropolitan Housing Authority task force, concentrating on drug related offenses. On March 30, 1999, around 10:10 p.m., Officer Rike was on bicycle patrol with other police officers in the area surrounding Parkside Homes, which is the most active public housing project in Dayton for illegal drug sales.
While riding down Marietta Drive toward Brennan Drive, Officer Rike observed a pickup truck parked along the curb. Two men were inside. Another male, later identified as Marcus House, was leaning inside the passenger window of the truck. As Officer Rike approached the truck, Marcus House looked at him, leaned inside the truck with both hands, and then began to walk away.
Officer Rike did not see any drugs or money change hands between Marcus House and the two men inside the truck. Rike nevertheless believed, based upon his experience in over one hundred drug arrests in the area, that he had just witnessed a drug deal because "that is how it is done."
Officer Rike grabbed Marcus House, and as he did Rike heard the driver of the truck start its engine. Officer Rike instructed the driver of the truck to turn the engine off. Sgt. Williams who was now in front of the truck also commanded the driver of the truck to stop. The driver of the truck failed to obey, and instead backed up in a reckless manner at a high rate of speed, going the wrong way down a one-way street. The driver then turned and drove down Hall Avenue in order to flee the scene, going the wrong direction.
Dayton police officer Will Wright was on routine patrol in a marked cruiser when he heard over his police radio Officer Benge ask for assistance in stopping the pickup truck. Officer Wright waited near Third and Portland Streets and saw the pickup truck go by, with Officer Oldham in pursuit. Officer Wright joined the chase. Officer Oldham stopped the truck at Third and Van Lear Streets.
Officer Oldham approached the driver of the truck while Officer Wright approached the passenger, who was Defendant Richie Wagoner. While Officer Wright stood next to the passenger door of the truck, speaking to Wagoner, he used his flashlight to illuminate the interior of the vehicle. Without opening the passenger door, sticking his head inside the truck or otherwise physically intruding into the passenger compartment, Officer Wright was able to observe a substance inside the doorhandle compartment, which he immediately recognized as crack cocaine. Officer Wright ordered Wagoner out of the truck. When Wagoner exited the truck, Officer Wright observed another piece of suspected crack cocaine on the passenger seat where Wagoner had sat. Officers seized both pieces of suspected crack cocaine. After they field tested positive for crack cocaine, Wagoner was placed under arrest.
ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN SUSTAINING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED AFTER SEEN IN PLAIN VIEW DURING A TRAFFIC STOP OF THE VEHICLE IN WHICH DEFENDANT WAS A PASSENGER.
In granting Wagoner's motion to suppress the crack cocaine recovered by police, the trial court stated:
LAW AND ANALYSIS
 Police should be allowed to stop a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity. Terry v. Ohio, 392 U.S. 1, 10(1968). The Court after reviewing this matter does not find the testimonies of Officer Rike and Officer Wright to be credible. Officer Rike testified he did not witness anything other than a person leaning in the window of a truck. As the Officers did not have any reason to initially stop the pick-up truck in which the Defendant was a passenger, the discovery of the crack cocaine should be excluded from the trial in this matter.
Accordingly, the Court SUSTAINS the Defendant's Motion to Suppress.
The State concedes that the initial attempt by Officer Rike to stop the pickup truck at Parkside Homes for suspected illegal drug activity may not have been lawful because police at the time lacked a reasonable suspicion of criminal activity necessary to justify such a seizure. Terry v. Ohio (1968), 392 U.S. 1. That, and not the later seizure of crack cocaine from the vehicle, was the basis of the trial court's decision suppressing the evidence in this case.
The trial court's finding that the officer's testimony was not credible appears to have been directed toward their testimony concerning their stop of the truck at Parkside Homes for suspected illegal drug activity. The court does not indicate on what specific matters it found the officers not to be credible, but the court went on to conclude that the officers lacked the reasonable suspicion of specific criminal activity necessary to justify the stop that was made, citing Terry v. Ohio, supra.
In State v. Maldonado (Sept. 24, 1993), Montgomery App. No. 13530, unreported, this court observed:
 Since the decision of the Supreme Court in State v. Bobo
(1988), 37 Ohio St.3d 177, police officers have more frequently cited the reputation of a vicinity as a "high crime area" when articulating their reasons for a Terry stop performed there. This may reflect the greater law enforcement focus on street-level drug crime, which is usually subtle in its methods and often violent in its consequences. However, those idiosyncracies do not diminish the requirements of the Fourth Amendment or its interpretation in Terry. The facts and circumstances before the officer must yet reasonably suggest that some specific criminal misconduct is afoot. That specificity requirement focuses on the criminal character of the act, not on its setting. Acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area. Acts that are not specifically criminal in character do not become criminal because they are inapposite to their setting and, therefore, "suspicious". The setting can inform the officer's judgment, but it does not make the act criminal. In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer.
Consistent with what we said in Maldonado, supra, the trial court appears to have rejected what the officers said they saw as a basis sufficient in law to form the reasonable and articulable suspicion that Terry requires of an investigative stop or detention. We cannot fault the court for arriving at that conclusion. Officer Rike's vast experience notwithstanding, the events he witnessed were essentially neutral in character. The fact that Parkside Homes is a hotbed of drug activity may have created in the officer's mind a strong hunch that a drug transaction was in progress, but it remained only a hunch. That the officer knew "that is how it is done" does not convert his hunch to a reasonable and articulable suspicion.
When considering the reasonable and articulable suspicion standard, it is useful to refer back from time to time to the facts in Terry. There, Cleveland Police Officer McFadden was on patrol in a downtown area that he had worked for thirty years. He saw two men standing on a corner, and concluded that "they didn't look right to me at the time."
 His interest aroused, Officer McFadden took up a post of observation in the entrance to a store 300 to 400 feet away from the two men. "I get more purpose to watch them when I seen their movements," he testified. He saw one of the men leave the other one and walk southwest on Huron Road, past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down Huron Road, looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual alternately between five and six times apiece — in all, roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man then left the two others and walked west on Euclid Avenue. Chilton and Terry resumed their measured pacing, peering, and conferring. After this had gone on for 10 to 12 minutes, the two men walked off together, heading west on Euclid Avenue, following the path taken earlier by the third man.
 Id., 392 U.S. 1, at pp. 5-6.
The Supreme Court characterized what Officer McFadden saw as an "elaborately casual and oft-repeated reconnaissance of the store" that created a reasonable and articulable suspicion that the men were "casing a job, a stick-up," Ibid. That, the Court held, was sufficient to permit him to detain them briefly for investigation. In the process, and because of the nature of the crime he suspected, Officer McFadden was also authorized to pat the men down for weapons in the process. The weapon he found on Terry, and whether it should be suppressed, was the focus of concern in the case.
A police officer need not have had Officer McFadden's vast experience to arrive at a reasonable and articulable suspicion. Neither is he required to let the situation "play out" quite so far as Officer McFadden did before the officer acts to stop or detains the person involved. Nevertheless, the particularity requirement of the Fourth Amendment demands some more substantial indicia of criminal conduct than the fact that it conforms with what the officer has seen in the past. The circumstances must connote criminal conduct, not necessarily to the exclusion of any other explanation but in a way that makes a criminal purpose predominate as an explanation for what the officer sees. An officer's incantation that "that is how it is done" does not rise to that level, his past experience notwithstanding. To permit a stop on that basis alone would make the officer's own conclusion, not the court's on review, the basis on which an alleged Fourth Amendment violation is determined, destroying in the process the independent judicial review that is a cornerstone of our constitutional rights.
The Fourth Amendment has been put under great strain by the so-called war on drugs. In large measure that is because the resources of law enforcement have mainly been devoted to stopping street-level drug transactions. Cleansing affected neighborhoods of that form of crime is surely worthwhile. However, the measures employed cannot offend the Fourth Amendment, which applies as fully in areas such as Parkside Homes as it does anyplace else.
Here, the officers saw no money or merchandise change hands before they approached the men at the truck. Neither did they wait to see whether Marcus House might repeat his conduct, forming a pattern that reasonably could support a suspicion that he was selling drugs. All-in-all, what they had before them was one man leaning into the window of a vehicle talking to its occupants. That was insufficient to form the reasonable and articulable suspicion that Terry requires, as the State concedes.
The evidence that the trial court suppressed was not, however, obtained in the course of the investigative stop that the officers performed at Parkside Homes. Instead, it was obtained after the driver of the truck drove away from that location in an illegal manner, and was again stopped several blocks away.
The several traffic violations that the officers saw the driver of the truck commit presented a lawful basis to stop the vehicle which was wholly supported by probable cause. Dayton v.Erickson (1996), 76 Ohio St.3d 3. Both the driver and the passenger could then be ordered from the vehicle in the course of that stop. Maryland v. Wilson (1997), 519 U.S. 408. Most importantly for our inquiry here, the lawful stop that the officers performed created an independent basis to seize any contraband that they found. Therefore, any illegality in the prior stop at Parkside Homes does not require or support suppression of any evidence obtained from the search and seizure that the later stop involved. State v. Richardson (Aug. 20, 1999), Montgomery App. No. 17667, unreported.
The trial court erred when it suppressed evidence that was seized after the truck in which Defendant Wagoner was a passenger was stopped at Third and Van Lear Streets on account of the defects which the court found in the prior stop of the vehicle that the officers had attempted at Parkside Homes. Defendant-Appellee argues that the seizure of crack cocaine that the officers performed on the later occasion failed to satisfy the "plain view" exception to the Fourth Amendment warrant requirement. That argument presents issues of fact that the trial court did not address. We are not disposed to resolve them on the record before us, especially in view of the inconsistencies in the officer's testimony which Defendant-Appellee has alleged and the trial court's findings against their credibility.
The assignment of error is sustained. The order of suppression will be reversed and the case will be remanded for further proceedings on Defendant-Appellee's motion.
FAIN, J. and YOUNG, J., concur.
Copies mailed to:
Cheryl A. Ross, Esq., Charles W. Slicer, III, Esq., HON. JOHN P. PETZOLD