OPINION
Defendant-appellant Bobby English appeals from his conviction and sentence, following a no-contest plea, for Possession of Cocaine. English contends that the trial court erred by denying his motion to suppress. English contends that the police officers who stopped him lacked a reasonable and articulable suspicion for an investigative stop. We conclude that when the information the officers had received from a confidential informant, whose information had proven reliable in the past, that English was going to engage in a drug transaction from his vehicle during a specified time frame, together with officers' observation, during that time frame, of a suspicious rendezvous between English's vehicle and another vehicle, constituted sufficient reasonable and articulable suspicion to justify an investigative stop. Accordingly, the trial court properly denied English's motion to suppress, and the judgment of the trial court is Affirmed.
 I
At about 3:00 p.m. on March 17, 2000, Dayton police officer Joseph Oldham was told by an informant, in person, that English, driving a black Lincoln Navigator, would deliver one quarter kilogram of cocaine to a location in the Edgewood Courts area between 6 and 7 p.m. that evening. Oldham testified that he had had dealings with the confidential informant approximately five times in the past, and that the information received from the informant had proven reliable in the past. Oldham testified that he had used the informant at some time within the month preceding March 17, 2000, and had recovered drugs in the past as a result of information received from the informant, including within the month preceding March 17th.
Oldham ran a computer check, verifying that Bobby English, who was known by Dayton police officer Michael Auricchio to go by the nickname used by the confidential informant, owned a black Lincoln Navigator. Other police officers found the Navigator parked at 1404 Glendale, the address listed in the vehicle's registration. A team of police officers was assembled to monitor English's movements, in an attempt to intercept the drug transaction. Police officer David House, and his partner, Kevin Phillips, began following the Navigator north on Philadelphia Drive some time after 5:00 p.m. It was still daylight. Earlier, the Navigator had passed by the Edgewood Courts area, without stopping. Shortly after this, the confidential informant called Auricchio on Auricchio's cell phone, and told Auricchio that he thought the deal was still "going down," but in another location. Auricchio testified that the confidential informant theorized that Edgewood Courts was "too hot," meaning that it was too obviously the subject of police interest. The confidential informant gave Auricchio two other locations, in the same general area, where the transaction might occur.
The Navigator left this area, but it was still being followed. The ultimate stop was well outside of the area within which the confidential informant had suggested the transaction would take place, but it occurred within the time frame suggested by the confidential informant.
With respect to the changed location of the drug transaction, the following excerpt from the transcript of Auricchio's testimony is significant:
 Q. Those instances, does it ever happen that the locations change or the location is taken at a different place from what the confidential informant gives you?
A. Yes, it does happen.
Q. How often?
 A. I would say fairly often the times change more than locations.
David House, the police officer who was following the Navigator north on Philadelphia Drive testified concerning the events leading up to the eventual stop, as follows:
 A. We were observing the Navigator as it continued northbound. Immediately upon passing the intersection of Siebenthaler, it becomes a small turn lane. We observed the Navigator turn on a right turn signal, move into the right turn lane, and slow down, appeared as if he was going to turn into the parking lot of this small convenience store.
 At that point in time we also observed there was a blue Pontiac Grand Prix, which was parked in the parking lot facing westbound toward Philadelphia Drive.
 Q. Excuse my ignorance for the direction you are giving. The Grand Prix now facing the Navigator like head on?
 A. If the Navigator would have turned into the parking lot, he would have been facing head on. However, the way he is sitting, the Navigator is still traveling northbound and the vehicle, the Grand Prix is facing westbound. So the front end of the Grand Prix is facing the passenger side of the Navigator.
 Q. Did you observe anything of significance of the Grand Prix?
 A. Yes. As the vehicle slowed, the Navigator slowed, and was at this time in the entrance to the carry out. We seen the driver of the Grand Prix flash his lights very quickly on and off. At that point in time the Navigator turn signal went off and he continued northbound, not making the turn into the carry out. Also immediately as he continued northbound, the driver of the Grand Prix pulled out onto Philadelphia, directly behind the Navigator and followed him northbound.
 Q. Could you tell how many occupants were in the Lincoln Navigator from where you were?
 A. At this point in time we had two people inside the Navigator.
 Q. Could you tell me how many were inside the Grand Prix?
 A. Two inside the Grand Prix, the driver and front seat passenger.
Q. Where did the vehicles go next?
 A. Continued northbound on Philadelphia for just a short distance and made a right turn onto Valerie Arms Drive.
 Q. What happened once they turned onto Valerie Arms?
 A. Once they made their turn onto Valerie Arms, the detective vehicle was being driven by Houser and Redden, pulled to the curb, and myself and Officer Phillips continued northbound past the intersection and continued northbound so the detectives could have a few moments to watch those vehicles and see what was transpiring.
 Q. When you say you continued northbound, did you pass the Navigator and Grand Prix, is that on the side street?
 A. They turned off on the side street and we turned northbound on Philadelphia after passing the side street.
 Q. Did you get any information on the radio what was occurring at Valerie Arms?
 A. We received information from the detectives that the driver of the blue Pontiac Grand Prix, who was later identified as a Michael Horn, had exited and had gone up to the Navigator and gotten into the back driver's side.
Q. Of the Navigator?
A. Yes, ma'am.
Q. What happened next?
 A. Another detective unit, which was Detective Brad Barnett, turned onto Valerie Arms, actually traveled past both those vehicles, verified the fact that there was an individual now in the back seat of the Navigator. He then continued on and pulled to the curb further west, in front of those vehicles, and continued to watch.
Q. And what did you do next?
 A. At this point in time, the decision was made that the transaction was probably taking place at this time inside the Navigator, and myself and Officer Phillips, who had turned around on Philadelphia, came southbound and turned onto Valerie Arms.
 Q. Okay. Once you got on Valerie Arms, what did you do?
 A. Officer Phillips was driving that night. He pulled to the curb directly behind the blue Grand Prix, which was directly behind the Lincoln Navigator. At that point in time he activated overhead lights and take down lights.
After the stop, drugs were found in the car, and, ultimately, on English's person. English was arrested and charged with Possession of Cocaine.
English moved to suppress the evidence, contending that it was obtained as the result of an unlawful stop. Following a hearing, English's motion to suppress was denied. Thereafter, English pled no contest, was found guilty, and was sentenced accordingly. From his conviction and sentence, English appeals.
 II
English's sole assignment of error is as follows:
 THE TRIAL COURT ERRED WHEN IT HELD THAT THE OFFICERS HAD A REASONABLE AND ARTICULABLE SUSPICION TO PERFORM A STOP ON THE VEHICLE OF MR. ENGLISH.
The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances. State v. Bobo (1988), 37 Ohio St.3d 177, first paragraph of syllabus.
Essentially, English argues that the information received from the confidential informant was insufficient to justify a stop, and the information obtained as a result of the observations of the officers following him was insufficient to justify a stop. He is probably correct in both of these assertions. However, the question is whether the combination of these circumstances is sufficient to constitute a reasonable articulable suspicion justifying an investigative stop.
In State v. Arrington (1990), 64 Ohio App.3d 654, and State v. Davie (February 11, 1993), Cuyahoga App. No. 63993, unreported, upon which English relies, investigative stops were held not to be supported by reasonable and articulable suspicion merely because a person or persons is speaking to someone in a car, and leaves the scene when approached by a police car. Significantly, however, in neither of those cases had there been a report, by a confidential informant of proven reliability, that the individual in the car was going to be selling drugs at that time. In the case before us, of course, the police did have that additional information.
Furthermore, the information was received not from an anonymous informant, as in Alabama v. White (1990), 110 Sup.Ct. 2412, but from a known confidential informant whose information had proven reliable in the past. English argues that the confidential informant in his case was not that reliable, because the drug transaction did not occur in any of the places specified by the informant. However, the informant did call the police, "shortly after" English was observed driving by the area that the informant had previously identified as being the place where the transaction was going to occur, to report that the deal was not going to take place at that location, possibly because it was "too hot," but that the deal would probably nevertheless take place during the time frame the informant had previously specified; that is, between 6 and 7 p.m. The informant then identified two alternative places where the transaction might take place, both of which were in the general vicinity of the first place specified. Admittedly, the transaction that appears to have been interrupted by the ultimate investigative stop was not at either of these locations.
In our opinion, the fact that the location for the transaction appears to have changed did not undermine the confidential informant's reliability to such an extent that it had no reliability at all. We agree that if the informant had been an anonymous informant, with no track record of reliability, as was the case in Alabama v. White, supra, the informant's reliability would not have been established by the informant's failed predictions of the location of the drug transaction. However, unlike the anonymous informant in Alabama v. White, supra, the confidential informant in the case before us had indicia of reliability based on that informant's past record, so that the informant's reliability did not depend solely upon accurate predictions of the suspect's future behavior.
We conclude that the information received from the confidential informant, that English was going to conduct a drug transaction out of the black Lincoln Navigator some time between 6 and 7 p.m. that evening, together with the suspicious rendezvous between the Lincoln Navigator and the blue Pontiac Grand Prix, constituted a sufficient basis for a reasonable and articulable suspicion that a drug transaction was taking place among the individuals who had come together in English's vehicle.
English's sole assignment of error is overruled.
 III
English's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
GRADY and YOUNG, JJ., concur.