OPINION
On February 27, 2001, Defendant-Appellant Ross S. Downing was cited for a marked lanes violation, failing to wear a seatbelt, OMVI/DUI, and obstruction of official business. Following a bench trial on July 9, 2001, Downing was found guilty of the marked lanes violation and the DUI, and acquitted on the other two charges. He was fined $520 and sentenced to 180 days in jail with 130 of those days suspended. His license was also suspended for eighteen months. Downing appeals this judgment raising the following assignments of error:
 Appellant was denied his constitutional right to effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteen [sic] Amendments to the United States Constitution and Sections Ten and Sixteen, Article One of the Ohio Constitution., Appellant was denied his right to review, on appeal, concerning issues raised by appellant as to trial counsel's performance because of the trial court's failure to properly make inquiry and/or preserve the record regarding appellant's complaints.
 The trial court's finding as to the charge of driving under the influence was against the manifest weight of the evidence.
 I
In his first assignment of error, Downing alleges that trial counsel was ineffective for failing to file a motion to suppress evidence surrounding the stop of Downing's vehicle, as well as Downing's refusal to submit to a breathalyzer test after he requested an attorney. When a defendant raises a claim of ineffective assistance of counsel, a two-step process is involved. We must first determine whether counsel has violated any essential duties to his client, and second, whether the defendant was prejudiced by counsel's ineffectiveness. State v. Bradley (1989),42 Ohio St.3d 136, 141-42, see also Strickland v. Washington (1984),466 U.S. 668, 687. When determining the ineffectiveness of counsel's performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 142, citingStrickland, supra, at 688. However, courts must begin with a strong presumption that counsel's performance was professionally reasonable.Id.
Even if counsel commits a professionally unreasonable error, the judgment will not be set aside unless the error had an effect on the outcome of the trial. Bradley, supra. "To warrant reversal, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id., citing Strickland, supra, at 694.
In order to determine whether trial counsel committed a professionally unreasonable error by failing to file a motion to suppress, we must first determine the likelihood of success for such a motion. If the motion would have been unsuccessful, we cannot say counsel was ineffective for not filing it. Downing first claims that the officer did not have reasonable suspicion to perform the field sobriety tests. The officer would have been permitted to detain Downing for the purpose of performing the field sobriety tests if he had a reasonable, articulable suspicion that Downing was driving while under the influence of alcohol in violation of R.C. 4511.19(A)(1). See, Terry v. Ohio (1968), 392 U.S. 1,21-22, 88 S.Ct. 1868, 1880; State v. Bobo (1988), 37 Ohio St.3d 177,178-79. The officer testified that he stopped Downing at approximately 1:30 A.M. after observing him swerve out of his lane four separate times. When he approached the vehicle, the officer noticed Downing's eyes were bloodshot and glassy and there was a strong odor of alcohol. Further, Downing admitted that he was coming from a bar and had consumed a beer and a shot prior to leaving.
Downing relies on our case of State v. Dixon (Dec. 1, 2000), Greene App. No. 2000-CA-30, unreported, at p. 2, in which we held that glassy, bloodshot eyes, the odor of alcohol and the admission of consuming a couple drinks was insufficient to justify administering field sobriety tests. The officer initially had stopped Dixon for a window tint violation, having witnessed no erratic driving. We held in Dixon that the facts were indistinguishable from the facts of State v. Spillers
(Mar. 24, 2000), Darke App. No. 1504, unreported, at p. 3. In Spillers, we found that weaving within one's own lane, the "slight" odor of alcohol and the admission of consuming a couple of beers was insufficient to justify the administration of field sobriety tests. We agree that those cases are both very close factually.
However, the facts of the present case can be distinguished from Dixon
and Spillers. Indeed, the facts before us are more similar to some other cases we have decided on this issue. See, State v. Marshall (Dec. 28, 2001), Clark App. No. 2001-CA-35, slip op. at pp. 3-5 (holding that bloodshot eyes, speeding and a strong odor of alcohol were sufficient to conduct field sobriety tests; specifically pointing out the distinction between a slight and strong odor); State v. Haucke (Mar. 17, 2000), Clark App. No. 99 CA 77, unreported (finding that the inability to follow traffic instructions combined with a strong odor of alcohol was sufficient to conduct field sobriety tests); State v. Morr (Feb. 27, 1998), Clark App. No. 97 CA 63, unreported (holding that weaving outside the lanes of travel, speeding, slow, deliberate speech, the smell of alcohol and stumbling out of the vehicle were sufficient to conduct field sobriety tests); State v. Toler (Jan. 30, 1998), Clark App. No. 97 CA 47, unreported (finding that weaving within and outside the lane of travel, strong odor of alcohol, glassy eyes and swaying were sufficient to administer field sobriety tests).
After reviewing all of the above cases, it appears that the smell of alcohol and glassy eyes at a late hour, without more, is not sufficient to conduct a field sobriety test. See, Dixon, supra, at p. 2. However, we conclude that the additional element of erratic driving or specifically a "strong" odor of alcohol seem to tip the scales in favor of allowing the tests. In the present case, the officer considered the following evidence relating to Downing: glassy, bloodshot eyes, a strong odor of alcohol on his breath, his admission of drinking a beer and a shot, and driving outside his lane of travel. We find that this was sufficient evidence to administer the field sobriety tests.
Next, Downing argues that the events surrounding his refusal to submit to a breathalyzer should also have been suppressed because he had invoked his right to an attorney and one was not present. We believe that Downing has confused the circumstances in which he is entitled to have an attorney present. Downing requested an attorney at some point after being read his Miranda rights. It is well settled that once an individual invokes his right to counsel that police must cease all further custodial interrogation unless and until an attorney is present.State v. Williams (1983), 6 Ohio St.3d 281, paragraph four of the syllabus. However, even after an accused invokes his right to counsel, police are still permitted to ask whether he or she will submit to a breathalyzer test. Dobbins v. Ohio Bur. of Motor Vehicles (1996),75 Ohio St.3d 533, 537, citing Schmerber v. California (1966),384 U.S. 757, 765, 86 S.Ct. 1826, 1832-1833. This is true because the results of chemical tests for alcohol are not considered testimonial, and therefore do not implicate the Fifth Amendment rights that Miranda sought to protect. Id. As a result, Downing had no Fifth Amendment right to consult with an attorney prior to submitting to a breathalyzer test.
Moreover, the United States Supreme Court has held that theSixth Amendment right to counsel only applies to "critical stages" of criminal proceedings. United States v. Gouveia (1984), 467 U.S. 180, 189,104 S.Ct. 2292, 2298. A chemical test for alcohol is merely a preparatory stage of the proceeding, and is not considered a critical stage where theSixth Amendment right to counsel would attach. Dobbins, supra, citingMcNulty v. Curry (1975), 42 Ohio St.2d 341, 344. Accordingly, we find that Downing did not have any constitutional right to counsel prior to submitting to or refusing to take the breathalyzer.
On the other hand, Downing did have a statutory right to consult with counsel upon arrest pursuant to R.C. 2935.20, which goes beyond the right to counsel secured by the federal and state constitutions. See,McNulty, supra, at 347. The courts have construed this statute to require the police to allow consultation with counsel prior to administering the breathalyzer; but police are not required to awaitarrival of counsel before it is administered. See, e.g., Lakewood v.Waselenchuk (1994), 94 Ohio App.3d 684, 691; State v. Mason (1994),99 Ohio App.3d 165, 167-68. In addition, the request to consult with an attorney must be made in good faith and may not be used to delay the test beyond the allotted two-hour time frame. Mason, supra.
Furthermore, because this right to counsel is statutory and not constitutional, the supreme court has held that the exclusionary rule does not apply. Fairborn v. Mattachione (1995), 72 Ohio St.3d 345. In other words, even if a violation of R.C. 2935.20 had occurred and the police did not permit consultation with counsel, the exclusionary rule would not provide for suppression of the evidence obtained after the violation.
The record is not completely clear surrounding Downing's contact with an attorney. Evidently, he had advised Officer Huffman at some point before arriving at the police station that he wanted his attorney present while the breathalyzer was administered. Officer Huffman informed him that the police would not wait for attorneys to arrive before performing the test. Once Downing and the officer arrived at the police station, Officer Huffman provided Downing with a phone book, and apparently he made contact with an attorney.
While the officer did not comply with Downing's request to have an attorney present during his breathalyzer test, the law does not require that he do so. Officer Huffman complied with R.C. 2935.20 by giving Downing a phone book and allowing him to consult with an attorney prior to administering the test. Therefore, the police did not violate any constitutional or statutory right to an attorney during Downing's arrest.
Based on the foregoing, any potential motion to suppress filed by trial counsel would have been overruled. As such, counsel was not ineffective for failing to file a motion to suppress. Downing's first assignment of error is overruled.
 II
In his second assignment of error, Downing challenges that the trial court erred in failing to address on the record his complaints about his trial counsel. In this regard, Downing sent a letter to the trial court on May 4, 2001 which was time-stamped and made part of the record. In this letter, he complained that his trial was only five days away and he had had no contact with his retained attorney. On May 9, 2001, the date the jury trial was scheduled, the following colloquy occurred on the record:
THE COURT:
* * *
 What concerns me, first of all, is a letter that I got on May 4th, and it expressed some concerns with your representation in this matter. And before we can proceed any further at all, I need to ask you some questions about whether or not you still want Mr. Creech to represent you. And it's up to you. I mean, if you don't, that's fine. I will give you the opportunity to get another attorney. If you want to continue, then you're probably facing jury trial this morning unless you would accept an offer — I understand an offer was made. I don't know what it is at this point. I don't want to know just right now, but, apparently, there was an offer made. If you don't want to accept that, that is fine, also. I would take a plea to it today if you wanted to accept the offer. But if you don't want to, you are set for a jury trial and we would have the jury trial today. And if you did want to discharge Mr. Creech as your counsel, I would need to know that and we could address that as well today?
 Do you want a couple minutes to think about it?
What was the offer, Mr. Creech? I don't know.
 MR. CREECH: Plead as charged. He does not want to accept that.
 THE COURT: Plead to the DUI and Obstructing of Official Business, okay.
THE DEFENDANT: Here's my thoughts, okay.
THE COURT: Okay.
 THE DEFENDANT: I wholeheartedly feel that the Obstruction of Official Business is crazy.
 THE COURT: But I don't want to know the details of that.
 THE DEFENDANT: This is the first I have heard from my attorney in over a month. That was 7:00 o'clock this morning. I know he is competent, and I know that during court today that he would represent me well. I don't feel that preparation has been made for today. I have yet to really sit down with my attorney and go — and say, [t]his is what happened. It's very hard for me to go into a trial today without at least telling my attorney what has happened to me.
THE COURT: I understand.
 THE DEFENDANT: I know that the results of the trial are pretty much one-sided in that it all depends on what the evidence is. My word is not the most influential. But I have a real issue with the fact that I don't think we've really sat down and gone over this. I feel that this is a very winnable case, and I would hate to go into this unprepared, yet I don't want to postpone this any longer. I don't want you thinking that I've not tried to be prepared for this day.
 THE COURT: I understand that, I do, but you need to make a decision.
 THE DEFENDANT: My contention is, we'll go to trial and see what we can do. And, hopefully —
THE COURT: Go to jury trial today then?
THE DEFENDANT: Yes.
MR. CREECH: Do you want me to represent you?
THE DEFENDANT: Yes.
 THE COURT: That was my question. Are you going to keep Mr. Creech on as your attorney to go to jury trial today?
THE DEFENDANT: Yes.
 THE COURT: All right. Then, if you will please have a seat out in the lobby, you all can talk about the case coming up, and we will find out where everybody is stacked today with respect to that. We will put you down as having a jury trial.
 And you are now withdrawing your request to have — I'm taking that as a Motion to have Mr. Creech removed as your counsel. And you are withdrawing that, that's my understanding?
THE DEFENDANT: Yes.
THE COURT: And you are comfortable with that?
THE DEFENDANT: Yes.
After a recess, the parties and the court came back on the record and Downing properly waived his right to a jury trial and requested a bench trial. This change warranted a continuance because only jury trials were being held that day.
On July 6, 2001, Downing sent another letter to the court, again alleging no contact with his attorney. He specifically complained that his attorney did not obtain a copy of a videotape from the police department. It is not clear anywhere in the record what this alleged videotape would show, just that Downing felt it was important to his defense, and he was unable to obtain it from the police department himself. The letter also admitted that Downing had intended to proceed to trial on May 9 with Mr. Creech as his counsel.
At the beginning of trial on July 9, 2001, the following colloquy occurred:
 THE DEFENDANT: There is an issue I think will need to be raised.
 THE COURT: Any issue will be raised by counsel. Anything else, Mr. Creech?
 MR. CREECH: Yes, Your Honor, can we approach the bench?
 Thereafter, a bench conference was held off the record, and then trial began.
Downing relies on State v. Deal (1969), 17 Ohio St.2d 17 for the proposition that the trial court had a duty to inquire into his complaints regarding his counsel. However, Deal and its progeny only impose a duty upon a trial court to inquire on the record about complaints a defendant has raised regarding his appointed counsel. Id. at 19-20. See, also,State v. King (1995), 104 Ohio App.3d 434, 437; State v. Prater (1990),71 Ohio App.3d 78, 82-83. These cases do not mention any duty of the trial court to inquire into complaints about retained counsel.
We found only one case that applied this standard to retained counsel. In State v. Taylor (Aug. 6, 1992), Franklin App. No. 91AP-531, unreported, at p. 3, the court recognized that the duty to inquire had heretofore only been applied to complaints regarding appointed counsel, but for purposes of that case decided to apply the same standard. Id.
Assuming arguendo that the trial court did have a duty to inquire into Downing's complaints, we find that an adequate inquiry was made on May 9, 2001 as described above. As far as Downing was concerned, the trial was to occur that day with Mr. Creech as his counsel. The court confirmed that Downing had wanted Mr. Creech to represent him at trial that day and he was comfortable with that decision. As it happened, trial was continued for two months. We do not believe that the trial court was under any duty to further inquire regarding Downing's satisfaction with his counsel.
Even when complaints are made regarding appointed counsel, the court will only intervene if the defendant can "show `a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel.'" State v.Coleman (1988) 37 Ohio St.3d 286, 292 (citations omitted). "Mere personality conflicts or disputes regarding trial strategy are insufficient to warrant the appointment of new counsel." State v. Davis
(May 19, 1998), Franklin App. Nos. 97APA08-1020, 97APA08-1021, unreported, at p. 3, citing Thurston v. Maxwell (1965), 3 Ohio St.2d 92,93. The only complaint raised by Downing in his July letter that was not raised in his May letter involved securing a videotape from the police department. Regardless of the validity of this complaint, the decision whether to introduce a video at trial was clearly one of trial strategy. Even if Downing had appointed counsel, there would be no reason for the trial court to substitute counsel based on the complaints in his July letter. Particularly because Downing had retained counsel, we find no basis for further inquiry by the trial court at the July 9 trial.
Accordingly, Downing's second assignment of error is overruled.
 III
Downing's final assignment of error alleges that his DUI conviction was against the manifest weight of the evidence. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id. Because the trial court had the opportunity to see and hear the witnesses, we must give substantial deference to its credibility determinations. State v. Lawson
(Aug. 27, 1997), Montgomery App. No. 16288, unreported, at p. 4. In fact, "we will not disturb the choice made by the trier of fact between credible witnesses and their conflicting testimony unless it is so incredible that it defies belief." City of Fairborn v. Boles (May 15, 1998), Greene App. No. 97-CA-110, unreported, at p. 3.
On February 27, 2001, at approximately 1:30 A.M., Downing was driving southbound on I-675 in the center lane. Officer Huffman, who was also traveling southbound in the center lane, noticed that a vehicle was traveling very closely behind Downing. While Huffman was observing these vehicles, he witnessed Downing drift over the left edge line twice. After watching a little more closely, the officer then noticed Downing drift over the right edge line twice. At this point, Officer Huffman initiated a stop of Downing's vehicle for the four marked lane violations. Once Officer Huffman turned on his lights, it took Downing some time before he actually pulled over.
When Officer Huffman was approaching the car, he recognized a strong odor of alcohol emanating from inside. Officer Huffman asked Downing for his driver's license, which he did not have. At that time, the officer noticed that Downing's eyes were glassy and bloodshot. Upon inquiry, he discovered that Downing was on his way home from the restaurant/bar where he worked and had had a shot and a beer prior to leaving there.
Based on all of this information, Officer Huffman asked Downing to exit the vehicle so that he could perform some field sobriety tests on him. When Downing exited the vehicle, the officer noticed the smell of alcohol on his breath. He first performed the horizontal gaze nystagmus test, which indicated a good chance Downing was intoxicated beyond the legal limit. The officer testified that, after performing this test, he had not formed the opinion that Downing was intoxicated, because only the breathalyzer could confirm that. However, he did testify that following the test, he formed the opinion that Downing was noticeably impaired. Thereafter, Downing refused to submit to any further field sobriety tests. Downing testified that he refused the tests because the location along the highway was too dangerous to perform the tests. Officer Huffman stated that all Downing told him was that he would not do any more of his tests.
Officer Huffman placed Downing under arrest for DUI and informed him of his Miranda rights. He then transported Downing and his passenger back to the station. The passenger accompanied them because she also was impaired and did not want to drive the car home. On the drive to the police station, the officer informed Downing that he would be asked to submit to a breathalyzer test and he explained the consequences of refusal or testing over the legal limit. At that point, Downing requested that an unbiased witness be present for the test, specifically an attorney. Officer Huffman explained that they would not wait for an attorney to arrive prior to performing the test, but that he could have his passenger as a witness.
It appears that this discussion continued when they arrived at the police station and eventually escalated into an argument. At some point, Officer Huffman provided Downing with a phone book to contact an attorney, but did not agree to await his arrival before performing any tests. The record indicates that Downing did contact an attorney. Thereafter, Officer Huffman asked Downing to move over to the breathalyzer to begin the test. Downing just looked at him. It was not until the officer handcuffed him and physically assisted him that Downing walked over to the machine. Then, after Officer Huffman gave instructions on how to take the breathalyzer test, Downing did not follow the instructions, so the machine did not register. After two unsuccessful attempts, Officer Huffman asked Downing to perform the test as instructed. Downing stated, "There, I took your test." The officer informed Downing that was considered a refusal and he incarcerated him in the Greene County Jail. On Downing's first try which was incomplete, the machine registered .067.
Downing testified at trial to substantially the same facts as stated above with a few deviations. He indicated that during the horizontal gaze nystagmus test he "caught" Officer Huffman looking away from him at one point. Downing also alleged that Officer Huffman informed him that if he was cooperative he would be able to go home that night. Throughout the whole encounter, Downing felt that Officer Huffman was hostile towards him, even screaming at him at times. Downing denied that Huffman had informed him of the consequences if he refused to take the breathalyzer. Downing also made several other allegations regarding Huffman that were completely irrelevant to the issues in this case.
After reviewing all of the evidence, we do not find that the court's decision finding that Downing had been driving under the influence of alcohol in violation of R.C. 4511.19(A)(1) was against the manifest weight of the evidence. Accordingly, Downing's third assignment of error is overruled.
Judgment affirmed.
FAIN, J., and YOUNG, J., concur.