DECISION AND JOURNAL ENTRY
 INTRODUCTION *Page 2 {¶ 1} Lieutenant Brian Simcox of the Akron Police Department stopped Wendy L. Wagner-Nitzsche's vehicle because he thought she might be moving a methamphetamine laboratory that she, reportedly, had been operating at her house. The trial court suppressed the evidence that was obtained from the stop and the subsequent searches of Ms. Wagner-Nitzsche's person, vehicle, and house because it determined that Lieutenant Simcox did not have reasonable suspicion to stop her. This Court affirms because the circumstances at the time of the stop did not give Lieutenant Simcox reasonable suspicion to believe criminal activity was afoot.
 FACTS {¶ 2} In July 2005, the police received a telephone call about illegal drug activity at Ms. Wagner-Nitzsche's house. In January 2007, they received a similar call. After receiving a letter about Ms. Wagner-Nitzsche's alleged drug activity in February 2007, Lieutenant Simcox began conducting surveillance of her house. He observed foot and vehicle traffic at the house that his training and experience told him was consistent with illegal drug activity. After a couple of days of surveillance, Lieutenant Simcox stopped one of the vehicles leaving the house and arrested the driver for possession of methamphetamine. A few days later, Lieutenant Simcox stopped another vehicle after it left Ms. Wagner-Nitzsche's house and arrested the driver for possession of marijuana. Lieutenant Simcox testified that the driver told him he had gotten the marijuana from Ms. Wagner-Nitzsche at her house.
 {¶ 3} Lieutenant Simcox continued monitoring the house for a few more days. On February 24, 2007, he was parked in a driveway a couple houses away from Ms. Wagner-Nitzsche's address when he observed "activity" at her vehicle. He observed someone get in and *Page 3 
out of the passenger's side of the vehicle and then go around the vehicle and get in the driver's side. Lieutenant Simcox testified that, through his experience, he knows that after a couple of arrests are made from a house where there is a methamphetamine laboratory, the occupants get paranoid and move their operation. He, therefore, thought it "was possible that whoever was messing with that vehicle might be putting stuff from the meth lab in the vehicle."
 {¶ 4} Lieutenant Simcox waited for the vehicle to leave and attempted to stop it. Before he could catch up to it, however, it made a "hard turn" onto another street and then a "hard turn" into a driveway. Lieutenant Simcox "felt that was suspicious." By the time he passed the driveway, Ms. Wagner-Nitzsche was at the front door of the residence and "stared at [him] as [he] went by."
 {¶ 5} Lieutenant Simcox waited for Ms. Wagner-Nitzsche to leave the residence, which was about ten minutes later. After she drove away, he stopped her vehicle and informed her that there had been "multiple complaints of drug activity at her house and that [he] was investigating the activity at her home." He asked Ms. Wagner-Nitzsche if there were any illegal drugs in her vehicle or on her person. She replied that there were not and consented to a search. When she exited the vehicle, Lieutenant Simcox noticed a pill bottle in her pants pocket. Ms. Wagner-Nitzsche handed the bottle, which did not have a prescription label, to Lieutenant Simcox, who saw through the top of the bottle that there was a bag inside of it. When Lieutenant Simcox opened the bottle, he found a bag of marijuana, Vicodin pills, and Percocet pills. He informed Ms. Wagner-Nitzsche that, unless she had a prescription, possession of Percocet was a fifth-degree felony.
 {¶ 6} Although Ms. Wagner-Nitzsche did not have a prescription with her, she told Lieutenant Simcox that she had one at her house. Lieutenant Simcox agreed to let Ms. Wagner-Nitzsche *Page 4 
return to her house to search for it. When they arrived at the house, she informed him that her boyfriend, John W. Pinkerton, was inside and that there were two firearms in the house. After entering, Ms. Wagner-Nitzsche told Mr. Pinkerton to search for the prescription. Because Lieutenant Simcox knew there were firearms in the house, he accompanied Mr. Pinkerton while he looked for the prescription. In one of the bedrooms, Lieutenant Simcox saw beakers, gas masks, and digital scales in plain view. From his training and experience, he knew that those items are used in the production of methamphetamine. The police subsequently obtained a search warrant for the house to recover the firearms and any other evidence involved in the production of methamphetamine.
 {¶ 7} The Grand Jury indicted Ms. Wagner-Nitzsche and Mr. Pinkerton for illegal assembly or possession of chemicals for the manufacture of drugs, illegal manufacture of drugs, aggravated possession of drugs, and illegal use or possession of drug paraphernalia. It also indicted Ms. Wagner-Nitzsche for possession of drugs, possession of marijuana, and having weapons while under disability. Ms. Wagner-Nitzsche and Mr. Pinkerton moved to suppress the evidence against them, arguing that the traffic stop of Ms. Wagner-Nitzsche's vehicle was not supported by reasonable suspicion, that the initial search of their home was conducted without a warrant, and that the search warrant relied on information that was illegally gathered and was not supported by probable cause.
 {¶ 8} The trial court granted the motion to suppress, concluding that, under the totality of the circumstances, the stop of Ms. Wagner-Nitzsche's vehicle "was not reasonable and was not supported by a particularized suspicion that criminal activity was afoot. Lieutenant Simcox's observations amount to nothing more than an unsupported hunch or suspicion that criminal activity might be afoot since it was possible that someone might be trying to move a Meth lab." *Page 5 
The court determined that any evidence gathered from the traffic stop or subsequent search of the house must be excluded as fruit of the poisonous tree. It also concluded that, after redacting the information obtained by Lieutenant Simcox, there was insufficient evidence to establish probable cause for the search warrant. The State has assigned one error, arguing that the trial court incorrectly granted the motion to suppress.
 REASONABLE SUSPICION {¶ 9} A motion to suppress evidence presents a mixed question of law and fact. State v. Burnside, 100 Ohio St. 3d 152, 2003-Ohio-5372, at ¶ 8. A reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." Id., but seeState v. Metcalf, 9th Dist. No. 23600, 2007-Ohio-4001, at ¶ 14
(Dickinson, J., concurring). The reviewing court "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."Id.
 {¶ 10} "A police officer may stop a car if he has a reasonable, articulable suspicion that a person in the car is or has engaged in criminal activity." State v. Kodman, 9th Dist. No. 06CA0100-M,2007-Ohio-5605, at ¶ 3 (citing State v. VanScoder, 92 Ohio App. 3d 853,855 (1994)). "[He] must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry v. Ohio, 392 U.S. 1, 21
(1968). "[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief that the action taken was appropriate?" Id. at 21-22 (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). *Page 6 
 {¶ 11} Whether a police officer had "an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture — a totality of the surrounding circumstances." State v.Andrews, 57 Ohio St. 3d 86, 87 (1991) (citing United States v.Cortez, 449 U.S. 411, 417-18 (1981); State v. Bobo, 37 Ohio St. 3d 177
(1988)). "[The] circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." Id. "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement."Id. "[A]n officer's reliance on a mere `hunch[,]' [however,] is insufficient to justify a stop." United States v. Arvizu, 534 U.S. 266,274 (2002).
 {¶ 12} The State has argued that Lieutenant Simcox had a reasonable suspicion that Ms. Wagner-Nitzsche was engaged in criminal activity. The police had received two telephone calls and a letter informing them that methamphetamine was being manufactured, used, and sold from her house. The author of the letter also stated that he had seen chemical burns on Ms. Wagner-Nitzsche's arms and face. Lieutenant Simcox had observed short-term foot and vehicle traffic that he knew from his training and experience was indicative of illegal drug activity. He had also stopped two vehicles immediately after they left Ms. Wagner-Nitzsche's address and found their drivers in possession of illegal drugs. One of the drivers told him that he had bought marijuana from Ms. Wagner-Nitzsche.
 {¶ 13} The State has also argued that Lieutenant Simcox had a reasonable suspicion that Ms. Wagner-Nitzsche was moving her methamphetamine laboratory. Lieutenant Simcox testified that he "saw somebody getting in and out of [her vehicle], and then . . . go around to the driver's side and get in." Lieutenant Simcox "[had] probably been in over 150 meth labs in [his] career . . . [and knew] that people that cook meth and use meth are extremely paranoid and *Page 7 
oftentimes move their meth labs." He also "[knew] that there [was] a good chance that [Ms. Wagner-Nitzsche] knew that I had arrested two people coming from her house, because they were friends." He, therefore, "believed there was a chance she was moving a meth lab from her house."
 {¶ 14} Lieutenant Simcox testified that, after he decided to stop Ms. Wagner-Nitzsche, his "concerns were heightened" by her driving. He noted that her speed and hard turns prevented him from catching up to her. He also noted that, after she pulled into another driveway, she "jumped out of the car and basically ran to the door before I could stop her. That further heightened my suspicion."
 {¶ 15} Having reviewed the totality of the surrounding circumstances, this Court concludes that Lieutenant Simcox did not have reasonable suspicion to stop Ms. Wagner-Nitzsche's vehicle. Although he had been informed that Ms. Wagner-Nitzsche was manufacturing, using, and selling illegal drugs from her house, the fact that he saw "somebody" get into and then back out of the passenger side of her vehicle, followed by seeing that same individual get into the driver's side of the vehicle and drive away was insufficient to give him "an objective and particularized suspicion that criminal activity was afoot." SeeAndrews, 57 Ohio St. 3d at 87. He did not actually see anyone place anything in the vehicle and stopped it on the mere "chance [that] she was moving a meth lab from her house." Lieutenant Simcox's testimony that he "believed there was a chance [that Ms. Wagner-Nitzsche] was moving a meth lab from her house" was the same as him saying that he relied on a mere hunch.
 {¶ 16} The State has not argued that the affidavit offered in support of the search warrant was sufficient to establish probable cause for the search of Ms. Wagner-Nitzsche's house without the evidence obtained by Lieutenant Simcox following the traffic stop. Accordingly, because *Page 8 
Lieutenant Simcox did not have reasonable suspicion to stop Ms. Wagner-Nitzsche's vehicle, the trial court correctly granted the motion to suppress. The State's assignment of error is overruled.
 CONCLUSION {¶ 17} Lieutenant Simcox did not have reasonable suspicion that Ms. Wagner-Nitzsche was moving a methamphetamine laboratory from her house. The trial court, therefore, correctly suppressed the evidence that was obtained from the stop of her vehicle and the subsequent search of her person, vehicle, and house. The judgment of the Summit County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
 Costs taxed to appellant. *Page 9 
WHITMORE, J. CONCURS