THE STATE OF OHIO, APPELLANT, *v*. BOBO, APPELLEE.

[Cite as State *v*. Bobo (1988), 37 Ohio St. 3d 177.]

(No. 87-664—Submitted February 3, 1988—Decided June 15, 1988.)

*John T. Corrigan,* prosecuting attorney, and *Jerome E. Dowling,* for appellant.

*Wesley A. Dumas, Sr.,* for appellee.

MOYER, C.J. In this case, the court is presented with the issue of what degree of conduct must a police officer observe to give rise to a "reasonable suspicion" justifying an investigative stop and a protective search of an automobile for the safety of himself and others. For the reasons stated below, we reverse the decision of the court of appeals.

In *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 18 O.O. 3d 472, 414 N.E. 2d 1044, paragraph one of the syllabus, this court held the following:

"The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances."

In *Freeman,* the appellant was stopped after he was observed sitting alone in an automobile in a motel parking lot with the engine turned off. As the appellant was stopped, the police officer explained to him that he had been stopped because there had then been much theft and criminal damage in the parking lot. During the investigative stop, another officer noticed a gun on the front seat of appellant's automobile. Appellant filed a motion to suppress which was overruled by the trial court. On appeal to this court, appellant asserted that "the officer did not have specific and articulable facts which would reasonably lead him to believe that appellant was involved in specific criminal activity," permitting the officer to seize the gun. This court held that the following facts permitted the officer to stop the appellant and, as a result, seize the gun: "(1) the location of the investigation being a high crime area; (2) the officer being quite aware of recent criminal activity in the motel parking lot in which appellant was parked; (3) the time of night being 3:00 a.m.; and (4) the appellant sitting alone in the car at the rear of the building for approximately 20 minutes with the engine turned off." *Id.* at 295, 18 O.O. 3d at 474, 414 N.E. 2d at 1047.

The appellant, state of Ohio, contends that the officers had a reasonable suspicion to stop Bobo under the guidelines found in *Terry* v. *Ohio* (1968), 392 U.S. 1, 44 O.O. 2d 383. The court in *Terry* stated at 19-20, 44 O.O. 2d at 392:

"* * * [I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one — whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

The court further stated at 21-22, 44 O.O. 2d at 393:

"* * * And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. * * * And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution

in the belief' that the action taken was appropriate?"

Appellant points to seven separate facts to justify the officers' investigative stop of Bobo: (1) the area in which the actions occurred was an area of very heavy drug activity in which weapons were prevalent; (2) it was nighttime, when weapons could easily be hidden; (3) Sergeant Mandzak, one of the officers who approached the vehicle in which Bobo was sitting, had about twenty years of experience as a police officer and numerous years in the surveillance of drug and weapon activity—included in this experience were about five hundred arrests each for guns or drugs city-wide and over one hundred arrests in the area in which Bobo was parked; (4) Mandzak's knowledge of how drug transactions occurred in that area; (5) Mandzak's observations of Bobo's disappearing from view then reappearing when the police car was close, looking directly at the officers and then bending down as if to hide something under the front seat; (6) Mandzak's experience of recovering weapons or drugs when an individual would make the type of gesture made by Bobo in ducking under his seat; and (7) the police officers' being out of their vehicle and away from any protection if defendant had been armed.

Our evaluation of these factors leads us to conclude that the stop in this case was reasonable. First, the area in which Bobo was parked was an area noted for the number of drug transactions which occurred there. "The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely" in determining whether an investigative stop is warranted. *United States* v. *Magda* (C.A. 2, 1976), 547 F. 2d 756, 758, certiorari denied (1977), 434 U.S. 878; *United States* v.

*Brignoni-Ponce* (1975), 422 U.S. 873, 884-885; *United States* v. *Hall* (C.A.D.C. 1976), 525 F. 2d 857, 859. Cf. *United States* v. *White* (C.A.D.C. 1981), 655 F. 2d 1302, 1304: "Past incidents of numerous law violations of a particular character definitely constitute a fact that officers may consider in the totality of circumstances they rely upon in arriving at a conclusion that they have probable cause to make an arrest." "* * * [T]he 'high-crime' character of an area is a relevant factor in determining probable cause." *Id.* See, also, *United States* v. *Thomas* (C.A.D.C. 1976), 551 F. 2d 347, 348; *United States* v. *Brown* (C.A.D.C 1972), 463 F. 2d 949, 950; and *United States* v. *Davis* (C.A.D.C. 1972), 458 F. 2d 819.

Second, the stop was made at approximately 11:20 p.m. *State* v. *Freeman, supra.* Third, the circumstances surrounding the stop must "be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States* v. *Hall, supra,* at 859. Here, the lead officer, Sergeant Mandzak, was a veteran of about twenty years on the force with hundreds of drug arrests. Fourth, he (and presumably the other officers) were familiar with the area and how drug transactions occurred there.

The fifth factor cited by the state was the officers' observation of Bobo popping up and then ducking down or leaning forward. A mere furtive gesture, standing alone, does not create probable cause to stop and search a vehicle without a warrant. *State* v. *Kessler* (1978), 53 Ohio St. 2d 204, 208, 7 O.O. 3d 375, 377, 373 N.E. 2d 1252, 1256. However, given the previous factors, such a movement may indicate an attempt to conceal a gun or drugs. Also, as noted above, Mandzak had a great deal of experience in making

drug arrests, and the gesture made by Bobo was one often made by those engaged in a drug transaction when confronted by the police. The last factor noted by the state, that the officers were out of their vehicle, goes to the reasonableness of the search and will be discussed below.

Under the totality of these circumstances, we find the officers reasonably stopped Bobo for investigative purposes. "* * * The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. * * *" (Citations omitted.) *Adams* v. *Williams* (1972), 407 U.S. 143, 145-146.

Given our conclusion that the investigative stop of Bobo was proper, we must next determine whether the officers reasonably searched Bobo's car. The United States Supreme Court recognized in *Terry* that a police officer may make a limited search in order to protect himself and the public. " 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons. * * * The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence,

and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Adams* v. *Williams, supra,* at 146, citing *Terry* v. *Ohio* (1968), 392 U.S. 1, 24, 30, 44 O.O. 2d 383, 394-395, 397-398. See, also, *Michigan* v. *Long* (1983), 463 U.S. 1032, 1049 ("search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons").

In the present case, the officers saw Bobo bend down as if to place something underneath the front seat of the car. This movement and the other factors discussed above, which justified the investigative stop of Bobo, also warranted a belief that Bobo might have immediate access to weapons. Therefore, the officers' need to provide for their own safety in itself justified a search of the vehicle for weapons. See *State* v. *Kessler, supra; State* v. *Smith* (1978), 56 Ohio St. 2d 405, 10 O.O. 3d 515, 384 N.E. 2d 280; and *State* v. *Woods* (1982), 8 Ohio App. 3d 56, 8 OBR 87, 455 N.E. 2d 1289.

"* * * [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual

whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry* v. *Ohio, supra,* at 24, 44 O.O. 2d at 394-395.

Accordingly, we hold that where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.

We therefore reverse the judgment of the court of appeals.

*Judgment reversed.*

LOCHER, HOLMES, DOUGLAS and H. BROWN, JJ., concur.

SWEENEY and WRIGHT, JJ., dissent.

WRIGHT, J., dissenting. Illegal drugs and the mayhem that accompanies them present our state and nation with a seemingly insoluble problem. As a private citizen who has worked with a number of individuals afflicted with substance abuse, I recognize the plague with which our safety forces are trying to deal. As a former safety director of a police department, I certainly sympathize with the frustration that police officers experience in patrolling "high crime areas" such as the one involved in this case. And as a former trial judge, I have seen explicit evidence of the drug-related turmoil that often occurs in these neighborhoods. In my present role, however, I feel bound to follow the mandates of the United States Supreme Court in its interpretation of the Fourth and Fourteenth Amendments to the federal Constitution. Therefore, I must respectfully dissent.

By no stretch of the imagination can the stop, arrest, and search involved in this case fall within the guidelines described in *Terry* v. *Ohio* (1968), 392 U.S. 1, 44 O.O. 2d 383.[1] *Terry* involved a search based on a mass of articulable facts and circumstances that justified a police officer's reasonable suspicion that a crime was about to take place. The search in the instant case, however, was based on an

---

[1] To accommodate competing interests in personal privacy and crime detection, the Supreme Court in *Terry* defined standards by which police detentions are to be tested in situations involving less than probable cause required for a lawful arrest. Even a temporary stop on the street, as is the case here, comes within the purview of the Fourth Amendment's stricture on seizures of the person and consequently calls for careful judicial scrutiny of its reasonableness. The *Terry* court stated that "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra,* at 19-20, 44 O.O. 2d at 392.

Later, the court opined that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest," *id.* at 22, 44 O.O. 2d at 394, but also stated that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *id.* at 21, 44 O.O. 2d at 393.

officer's mere suspicion generated by little more than the fact that the defendant was legally parked in a high crime area.

In every metropolitan area in this nation, there are neighborhoods where illegal drug sales run rampant and many of the residents are armed and ready for trouble. Any team of police officers could make a dozen "valid" arrests under the test announced in today's majority opinion. I cannot see how we can create what amounts to a "high crime area" exception to the protections extended by the Fourth and Fourteenth Amendments. Perhaps it would be good public policy to adopt such a rule, but I do not see how we can do so under the controlling case law in this area as set forth by the United States Supreme Court.

Besides the general assertion that this case falls under the guidelines found in *Terry,* the majority cites only one Supreme Court case, *United States* v. *Brignoni-Ponce* (1975), 422 U.S. 873, as support for a "high crime area" exception. That case, however, involved an entirely different type of search. If anything, that case supports appellee's position in the case at bar. In *Brignoni-Ponce,* the United States Border Patrol stopped a vehicle near the Mexican border and questioned its occupants about their citizenship and immigration status when the only ground for suspicion was that the occupants appeared to be of Mexican ancestry. The court held that, except at the border and its functional equivalents, patrolling officers may stop vehicles only if they are aware of specific articulable facts, together with rational inferences therefrom, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Id.* at 884. Therefore, it is apparent that the "reasonable suspicion" test of *Brignoni-*

*Ponce* requires some objective evidence of involvement in crime before an investigative stop will be justified.

The majority also cites two decisions from the United States Courts of Appeals in support of its position, but these cases can and should be distinguished. These cases indicate that the reputation of a particular neighborhood for crime is not in and of itself sufficient to warrant "reasonable suspicion" for an interrogatory stop. These cases stand for the premise that "specific and articulable facts" of an independent nature—*i.e.,* facts other than the observation of the defendant in a high crime area—must be present before a police officer can stop and interrogate a party. The record of this case reveals that no "specific and articulable" facts, other than the fact the car was parked in a high crime area, were present in the instant case.

As Judge Motley recognized in his dissent in *United States* v. *Magda* (C.A. 2, 1976), 547 F. 2d 756, 759, a case relied on by the majority:

"It is enticing to place too much weight on the 'high crime factor.' * * * Even when it can be shown that criminal activity is more likely in one geographical area than another, courts are extremely hesitant to acknowledge this as a strong factor in satisfying the standards required for an interrogatory stop. * * * *The fact that the area is notorious for criminal activity can only be considered when other less ambiguous facts are present which would lead one to suspect that criminal activity is afoot."* (Emphasis added.) *Id.* at 763-764.

The facts present in this case are fraught with ambiguity. Indeed, it is apparent from the testimony of the arresting officer, Sergeant Mandzak, that the *sole* reason the police officers stopped at the car was that it was parked in a neighborhood known for

drug activity. The record indicates that appellee and a female companion were legally parked on a public street in Cleveland. Mandzak and two other detectives drove past the parked car before returning to investigate. On cross-examination, Mandzak offered this reason for stopping:

"At that time the only thing that drew our suspicion to the car was that it was parked by an open field with no—there's nothing around there. And that we do have a lot of drug activity in that area there, and just by parking there in an open field with no apparent objectivity, we decided to circle the block and to check this car out. Then when we did so, we saw there was only one person seated in the car, whereas when we first saw this car we saw two people in the car."

A later exchange between defense counsel and Mandzak again addressed this issue:

"Q. So, in other words, you had no reason to approach the car at that point in time because of any illegal activity?

"A. Except for the fact that the car was parked in an area that is highly, highly—and when I say highly, I mean very high area of drug sales. The car was parked by an open field with no apparent objectivity.

"Q. But again—

"A. This is the reason why we are checking it out. Just the very fact that it is parked there and that there is no reason for it to be there. We don't see cars parked there.

"Q. Again, sir, that is not illegal, is it?

"A. No, but it is enough to draw our suspicion.

"Q. Was there anybody else around the car?

"A. No.

"Q. So there was nobody that was coming to and from the car that would appear that they had made a drug sale?

"A. No, not at that particular time.

"Q. The car was isolated as a matter of fact?

"A. Except for the police car. It was recognizable."

After approaching the car, Mandzak testified that he saw appellee sit up and then make a motion that "looked like he was putting something underneath the seat." But other testimony by Mandzak demonstrates that this assertion was unsupported and that any suspicion resulting therefrom was clearly unwarranted.[2] The facts in this case tend to indicate that, if anything, a romantic tryst, not a drug deal or any

_____

[2] The following exchange took place between defense counsel and Mandzak:

"Q. So that the best you can say is that you saw someone bend down; am I correct?

"A. At what point?

"Q. Wouldn't you say you saw him make this motion?

"A. Yes.

"Q. You don't know what his hands did, do you?

"A. It looked like he was putting something underneath the seat.

"Q. Were you able to see his hands?

"A. No.

"Q. So you don't know if he made a hand movement or not, do you?

"A. I don't know what he did. It looked like he was putting something under his seat.

"Q. You don't know that, do you?

"A. I was suspicious of it.

"Q. The best you could tell, all he could have been doing is bending down and his hand not go below the seat?

"A. It is possible.

"Q. You don't know if his hand was even outstretched, do you?

"A. It looked like he was bending down.

other illegal activity, was occurring in the car.[3] Mandzak was unable to point to *any* "specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant * * * [an] intrusion" by police.[4]

In evaluating the reasonableness of a search under these circumstances, the *Terry* court at 21-22, 44 O.O. 2d at 393, stressed that an objective standard must be employed:

"* * * [W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

I cannot agree that the action taken in the instant case was appropriate. I believe this case involves an intrusion upon constitutionally guaranteed rights. Indeed, the United States Supreme Court has consistently refused to sanction an illegal search "based on nothing more substantial than inarticulate hunches * * *." *Id.* at 22, 44 O.O. 2d at 393.

Therefore, for the foregoing reasons, I must respectfully dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.

---

"Q. You don't know if his hand was outstretched, do you?
"A. How do you mean outstretched?
"Q. In this fashion, in front of him?
"A. I couldn't see his hands.
"Q. Could you see his arms?
"A. I saw the back part of his body.
"Q. Could you see his arm?
"A. No."

[3] The female occupant testified that she and appellee went out to dinner and then they parked on the street. It appears they were parked for more than an hour before the police arrived. In addition, Mandzak testified that when he looked into the car, "she [the female occupant] was fastening her clothing."

[4] See fn. 1, *supra.*