OPINION
{¶ 1} Defendant-appellant James Schooler appeals from his conviction and sentence, following a no-contest plea, for Carrying a Concealed Weapon. Schooler contends that the trial court erred by denying his motion to suppress. We agree. Consequently, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 I {¶ 2} On October 15, 2002, Dayton police officer Mark Ponichtera was dispatched to 814 Wicklow Place, based upon a report by a caller that there was a blue Chevrolet Corsica parked in front of 814 Wicklow, with a white female and a black male sitting in the car for several minutes, which the caller felt was suspicious. Ponichtera testified that he was dispatched "approximately around 6:15 and 6:25," but it is not clear whether this was in the morning or evening. Ponichtera did not testify that it was dark outside when he approached the car.
 {¶ 3} Ponichtera arrived within a few minutes, and approached the car from the front. The woman was sitting in the driver's seat, and the man, Schooler, was sitting in the passenger seat. Ponichtera noticed nothing out of the ordinary. The car had a Preble County license plate. Ponichtera cannot recall whether the motor was running.
 {¶ 4} As Ponichtera approached the car, he noticed Schooler "kind of look down at his feet and kind of bent over." Ponichtera characterized that "as though he was going to tie his shoe. He leaned down and bent down to under the seat where his feet would be."
 {¶ 5} Ponichtera asked the woman, a Ms. Mustaine, to step out of the car, so he could talk to her independently. Ponichtera was attempting to keep an eye on Schooler at the same time, and noticed that Schooler "continued to reach down below where his feet are." Ponichtera did not see what Schooler was reaching for or putting away.
 {¶ 6} Ponichtera testified that when he "began to see those movements," he took Mustaine and put her in his cruiser, and then went back and asked Schooler to step out of the car. Ponichtera did a pat-down on Schooler, and put Schooler, also, in the back seat of Ponichtera's cruiser. Ponichtera cannot recall whether he had handcuffed Schooler at this point, but he did testify that the back of his cruiser was locked, so that neither Schooler nor Mustaine could get out.
 {¶ 7} On cross-examination, Ponichtera testified that his suspicions had not been aroused, to the point of needing to get Schooler out of the vehicle immediately for his safety, as the result of the first observed movement:
 {¶ 8} "Q. Okay. And at that point, because Mr. Schooler had bent over the one time, were your suspicions aroused that you needed to get him out of the vehicle immediately for your safety?
 {¶ 9} "A. No. Not at that time. It is when the second, the, you know, the second movement happened, which I felt, you know, it happened a second time in a very close interval of time as I'm walking up, and/or I'm talking to Ms. Mustaine, I deemed it to be furtive and suspicious."
 {¶ 10} Ponichtera had not noticed anything suspicious in the car before placing Mustaine and Schooler in the back of his cruiser. After he secured them in the back of his cruiser, however, he went back to their car, looked in, and saw what he described as a black, man's shaving kit on the floorboard of the car in the area where he believed Schooler had been reaching. This kit had a zipper, and was partly unzipped. At this time, with Schooler and Mustaine secured in the back seat of his cruiser, Ponichtera saw what he believed to be the hammer of a gun protruding from the unzipped part of the opening of the shaving kit. Ponichtera picked up the kit, and noticed that it was heavy, consistent with his belief that there was a gun inside. Ponichtera then unzipped the bag, and found a loaded firearm and some papers in the bag.
 {¶ 11} Schooler was arrested and charged with Carrying a Concealed Weapon, and with Having a Weapon Under a Disability. Schooler moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, Schooler's motion was overruled. Thereafter, Schooler pled no contest to Carrying a Concealed Weapon, and the State dismissed the Having a Weapon Under a Disability charge. Schooler was found guilty of Carrying a Concealed Weapon, and sentenced accordingly. From his conviction and sentence, Schooler appeals.
 II {¶ 12} Schooler's sole assignment of error is as follows:
 {¶ 13} "Because appellant was deprived of his constitutional right to freedom from unreasonable searches and seizures, evidence seized by the police should have been suppressed from use at trial."
 {¶ 14} The State contends, and we agree, that the encounter between Ponichtera and Schooler was initially consensual. However, by the time Mustaine and Schooler had been removed from the car and placed in the back seat of Ponichtera's cruiser, locked so that they could not get out, with Schooler having been patted down for weapons, a detention had occurred. An investigative detention requires reasonable and articulable suspicion. Terry v. Ohio (1968), 392 U.S. 1.
 {¶ 15} The State relies heavily upon State v. Bobo (1988),37 Ohio St.3d 177, for the proposition that the furtive gesture or gestures Ponichtera observed justified a detention. Although the issue is close, we disagree.
 {¶ 16} As noted in State v. Bobo, at 37 Ohio St.3d 179, a mere furtive gesture, standing alone, does not create probable cause to stop and search a vehicle without a warrant. State v. Kessler (1978),53 Ohio St.2d 204, 208, 7 O.O.3d 375, 377, 373 N.E.2d 1252, 1256.
 {¶ 17} In State v. Bobo, the court cites seven separate facts justifying the investigative stop. The first of these is that the area in which the actions occurred was an area of very heavy drug activity in which weapons were prevalent. In the case before us, by contrast, although Ponichtera testified that he had made numerous arrests in the area, he could not say what those arrests had been for.
 {¶ 18} The second factor in Bobo is that it was nighttime, when weapons could easily be hidden. In the case before us, there is no testimony in the record that it was nighttime, or that it was dark.
 {¶ 19} The third factor cited in State v. Bobo, supra, is that one of the officers who approached the vehicle in that case had about twenty years of experience as a police officer, and numerous years in the surveillance of drug and weapon activity, including about 500 arrests each for guns or drugs, and over 100 arrests in the area in which that defendant was parked. In the case before us, Ponichtera testified that he had been a police officer for 11 years, and that he had made numerous arrests in the area where these events transpired, but he did not relate his experience with arrests for guns or drugs.
 {¶ 20} The fourth factor cited in State v. Bobo, supra, is the police officer's knowledge of how drug transactions occurred in that area. No comparable factor is cited in the case before us.
 {¶ 21} The fifth factor cited in State v. Bobo, supra, is the officer's "observations of Bobo's disappearing from view than reappearing when the police car was close, looking directly at the officers and then bending down as if to hide something under the front seat." This is close to the situation in our case, since Ponichtera's observations, while described as similar to Schooler's reaching down to tie his shoe, are consistent with Schooler having bent down as if to hide something.
 {¶ 22} The sixth factor cited in Bobo is the police officer's "experience of recovering weapons or drugs when an individual would make the type of gesture made by Bobo in ducking under his seat." There is no comparable evidence in the case before us. Ponichtera did not relate the gesture he observed to his experience. In fact, he did not indicate what activity he suspected might be occurring, merely that Schooler's second movement caused him to become suspicious.
 {¶ 23} The final factor cited in State v. Bobo, supra, is "the police officers' being out of their vehicle and away from any protection if defendant had been armed." This factor is also present in the case before us.
 {¶ 24} Although the issue is close, we conclude that the case before us is distinguishable from State v. Bobo, supra. Significantly, Ponichtera never testified as to any particular criminal activity that he became suspicious of, as a result of Schooler's second movement. Unlike the testimony in State v. Bobo, supra, Ponichtera did not connect his previous experience observing similar gestures to any particular suspicions of criminal activity. Furthermore, although there was testimony that this was a "transitional" area, where Ponichtera had made numerous arrests, it was never identified as an area with heavy drug activity in which weapons were prevalent. We conclude that the case before us involves a "mere furtive gesture," which, standing alone, does not justify an investigative stop.
 {¶ 25} Schooler's sole assignment of error is sustained.
 III {¶ 26} Schooler's sole assignment of error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
Wolff and Grady, JJ., concur.