**[Cite as *State v. Abner*, 194, Ohio App.3d 523, 2011-Ohio-4007.]**

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

THE STATE OF OHIO,                    :

     Appellee,                         :          C.A. CASE NO.   24140

v.                                    :          T.C. NO.    09CR3335

ABNER,                                :            (Criminal appeal from
                                          Common Pleas Court)

     Appellant.                        :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___12th___ day of ___August___, 2011.

. . . . . . . . . .

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Laura M. Woodruff, Assistant Prosecuting Attorney, for appellee.

Christopher A. Deal, for appellant.

. . . . . . . . . .

DONOVAN, Judge.

{¶ 1}   On October 7, 2009, around 11:00 p.m., Officer Gustwiller and Officer Dedrick were on duty, patrolling in an area designated by police as the Phoenix Project. Officers were assigned to patrol the Phoenix Project to address criminal activity in the eight-block area surrounding Good Samaritan Hospital.   Gustwiller had been assigned to this area for over a year.   Dedrick had been assigned to the area for about two and one-half years.   While on patrol, the officers pulled into the Walgreen's parking lot located at 2710

Salem Avenue. The Walgreen's is open 24 hours a day. Based on the officers' previous knowledge and experience, they were aware that the parking lot was often used for doing and dealing drugs. Gustwiller testified that he had personally made around 250 drug-related arrests in that general area, with approximately 30 arrests at the Walgreen's parking lot.

{¶ 2} When the officers entered the parking lot they noticed a large truck that was not pulled all the way into its parking spot and was sticking out four to five feet in the thoroughfare of the parking lot. The truck was parked in a space that fronted Salem Avenue near an ingress area. The officers approached the vehicle to see if they could determine the reason the truck was parked haphazardly. The officers noticed that the truck had an out-of-county license plate. Gustwiller testified that to his knowledge and experience, persons from outside Montgomery County come to that area for the purpose of purchasing drugs. Gustwiller testified that he walked around the truck to make sure no one was lying down inside. The only thing he observed inside the cab of the truck was a blue phone. There was no one in the vehicle.

{¶ 3} As the officers returned to their cruiser, two males, one being defendant-appellant, Hiram Abner, exited Walgreen's and walked toward the truck. Dedrick asked the men if the truck was their vehicle. At that point, the driver stopped and spoke to Dedrick while Abner kept walking toward the truck. Dedrick had also asked Abner to come to him; however, Abner continued walking toward the passenger side door of the truck. Gustwiller then went around the back of the truck, where Abner already had the passenger-side door open. Abner's left hand had a Walgreen's bag in it, and Gustwiller testified that he could not see his right hand at that time. Once Abner had the door open, he

stuck both hands inside the cab, where Gustwiller was unable to see them. Gustwiller testified that Dedrick (who was talking to the driver) told Abner to show his hands, but he did not immediately do so. However, on both direct and cross-examination, Dedrick did not assert that he had directed Abner to show his hands.

{¶ 4} Gustwiller testified that Abner's actions concerned him because he did not know whether Abner was trying to hide or retrieve a weapon. Gustwiller grabbed Abner and had him step aside. After seizing Abner by the shoulders, Gustwiller saw a clear plastic baggie sitting on the seat of the truck, next to the Walgreen's bag. It was determined to contain heroin. Abner was then placed under arrest.

{¶ 5} Abner was indicted on December 2, 2009, on one count of possession of heroin in excess of one gram but less than five grams in violation of R.C. 2925.11(A). A motion to dismiss and/or suppress and a memorandum in support of defendant's motion was filed on March 17, 2010. In that motion, Abner argued that the evidence obtained by the state should be suppressed because the search (1) was performed without a warrant, (2) was performed without consent of appellant, (3) was not based upon probable cause, and (4) was not within the scope of a search incident to a lawful arrest. Abner argued that his rights under the Fourth Amendment to the Constitution of the United States as well as his constitutional rights guaranteed by the Ohio Constitution were violated.

{¶ 6} The trial court issued a decision overruling the motion to suppress and finding that no stop had occurred until Gustwiller seized appellant by the shoulders. The trial court found that while the officers may not have had reasonable articulable suspicion to stop appellant initially, appellant's actions when he approached the truck reached "the level

of a furtive movement," and so the officer was justified in seizing appellant to protect the officers' safety. According to the trial court, once appellant was moved, following a justified seizure, the contraband was then in plain view.

{¶ 7} In cases involving a motion to suppress, the trial court is the fact-finder in the case and, therefore, is in the best position to determine the facts of the case and the credibility of the witness. *State v. Retherford* (1994), 93 Ohio App.3d 586. Thus, the appellate court is required to accept the trial court's findings of fact when they are supported by competent and credible evidence. Id. The appellate court must then, without deference to the trial court's decision, decide whether those facts meet the requisite legal standard. Id.

## FIRST ASSIGNMENT OF ERROR

{¶ 8} "The trial court erred when it denied appellant's motion to suppress."

{¶ 9} In his first and only assignment of error, appellant claims that the trial court erroneously denied his motion to suppress for two reasons: (1) the officer's observations did not amount to reasonable suspicion that appellant had engaged in criminal activity and so the stop and seizure of appellant was unlawful and (2) there were no furtive movements by appellant to justify his seizure. Specifically, Abner claims that the officers did not witness any activity either by him or his companion that could be considered suspicious behavior. Therefore, he claims, the officers did not have reasonable suspicion to stop and seize him. In addition, Abner argues that putting his hands into the passenger side of the truck was an innocent act, not a "furtive movement," and therefore, seizing him out of concern for the officer's safety was not justified.

{¶ 10} The Fourth Amendment guarantees "[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Fourth Amendment, United States Constitution. One exception to the warrant requirement is that an officer can conduct a reasonable search for weapons "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio* (1968), 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. However, the officer must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21.

{¶ 11} In analyzing what conduct a police officer must observe to justify an investigative stop and search under *Terry*, the Ohio Supreme Court takes a totality-of-the-circumstances approach. *State v. Bobo* (1988), 37 Ohio St.3d 177, 180. "[W]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." Id. In *Bobo*, the court took into account seven facts in determining that the police officer was justified in his actions: "(1) the area in which the actions occurred was an area of very heavy drug activity in which weapons were prevalent, (2) it was nighttime, when weapons could easily be hidden, (3) Sergeant Mandzak, one of the officers who approached the vehicle in which Bobo was sitting, had about twenty years of experience as a police officer and numerous years in the surveillance of drug and weapon activity—included in this experience were about five

hundred arrests each for guns or drugs city-wide and over one hundred arrests in the area in which Bobo was parked, (4) Mandzak's knowledge of how drug transactions occurred in that area, (5) Mandzak's observations of Bobo's disappearing from view then reappearing when the police car was close, looking directly at the officers and then bending down as if to hide something under the front seat, (6) Mandzak's experience of recovering weapons or drugs when an individual would make the type of gesture made by Bobo in ducking under his seat, and (7) the police officers' being out of their vehicle and away from any protection if defendant had been armed." Id. at 179. These facts, analyzed together, amounted to a justification that the search of the vehicle for weapons was necessary in order to secure the officer's safety.

{¶ 12} In addition to the factors above, a defendant's movements, such as furtive gestures, can be considered in analyzing whether police officers had enough to amount to a reasonable suspicion of danger. "A furtive gesture may be defined as a situation where 'police see a person in possession of a highly suspicious object or some object which is not identifiable but which because of other circumstances is reasonably suspected to be contraband and then observe that person make an apparent attempt to conceal that object from police view.' " *State v. Allen*, Montgomery App. No. 23738, 2010-Ohio-3336. Although furtive movements alone would not be sufficient to justify a search, they can be considered in making a totality-of-the-circumstances determination. Id.

{¶ 13} In *State v. Jarnigan*, this court found that the trial court properly denied a motion to suppress because the police officers in the case had a reasonable and articulable suspicion of criminal activity. *State v. Jarnigan*, Montgomery App. No. 22682,

2009-Ohio-1640. Officers were "checking known drug areas" when they observed a vehicle parked in the back corner of a parking lot, away from the business's entrance. Id. at *1. The vehicle had an out-of-county sticker, and the driver was observed doing something in her lap. Id. Officers pulled up to the car after a few minutes of observation and yelled at the occupants to show their hands. Id. The driver then made a "grinding motion into her seat with her right hand between her legs." Id. Because the driver did not obey the officer's orders to show her hands, she was ordered out of the car. Id. As the driver exited the vehicle, the officer noticed a white powder on the seat and a crack pipe on the floorboard. Id.

{¶ 14} The officer testified that the area was known as a high-crime area, and that in his experience those areas of the parking lot were used for purchasing and consuming illegal drugs. Id. at *2. The officer also testified that persons in vehicles with out-of-county stickers were often on the lot for the purpose of partaking in illegal drug use. Id. Furthermore, the officer testified that the actions of the driver were consistent with the movements one makes when preparing drugs for use. Id. The trial court found that because of the experience of the officers, the fact that they patrol that area on a daily basis and know what activities occur at that location, meant that the officers had a sufficient, reasonable and articulable suspicion to justify a *Terry* stop in this case. Id. at *2-3.

{¶ 15} This court has also found, however, that a furtive gesture alone does not arise to reasonable suspicion and does not justify an investigative stop. *State v. Schooler*, Montgomery App. No. 20142, 2004-Ohio-3578. In *Schooler*, a police officer was responding to a complaint of a suspicious car parked on a street. Id. at *1. As the officer

approached the car, he noticed that the vehicle had out-of-county plates but did not notice anything else out of the ordinary. Id. After the officer asked the driver to step out of the vehicle, he noticed the passenger "reach down below where his feet are," and he subsequently asked the passenger to step out because he believed the passenger's actions to be "furtive and suspicious." Id. After the passenger was placed in the police cruiser, the officer went back to the car and discovered a gun and some papers in a bag in the floorboard of the car. Id. at *2.

{¶ 16} This court analyzed the *Bobo* factors in connection with the testimony that the officer observed furtive gestures and found the search and seizure to not have been warranted. Id. First, although the officer stated that he had made arrests in the area before, he could not identify the reasons for the arrests. Id. Second, there was no testimony that it was dark or that it would have been difficult for the officer to see any weapons. Id. at *3. Third, although the officer had many years of experience on the police force, he did not testify as to his experience with guns or drugs. Id. Fourth, the defendant's action of reaching down to the floorboard of the car was consistent with the observations noticed by the police officer in *Bobo*, where the defendant bent down in the front seat. Id. However, unlike in *Bobo*, the officer did not relate the defendant's actions with the officer's experience in recovering weapons or drugs, just that the movement was suspicious. Id. Fifth, the officer was out of his vehicle and away from protection. Id. Even though several of the *Bobo* factors were evident in *Schooler*, the court found that the furtive gesture was not enough to justify the investigative stop, because the defendant's gestures did not arise to any particular suspicion of criminal activity. Id.

{¶ 17} Some of the *Bobo* factors are present in this case. First, like in *Bobo*, the area that the officers were patrolling, the Phoenix Project, was known for its high level of criminal activity. Second, the officers pulled into the Walgreen's parking lot around 11:00 at night. Third, both officers had experience patrolling this particular area. Officer Gustwiller had been assigned to the area for over a year, and Officer Dedrick had been patrolling the area for over two and one-half years. Fourth, the officers were familiar with how the drug transactions in the area occurred; however, the facts available to them at the time of Abner's seizure did not support a conclusion that drug activity or any criminal activity for that matter was afoot. In addition, both police officers were out of their vehicles and speaking with the driver, and were not afforded the protection of the cruiser.

{¶ 18} Although several *Bobo* factors are present, those factors are underwhelming and there is not enough evidence in the record to support the trial court's decision to overrule the defendant's motion to suppress. First, the police officers did not have a reasonable basis to conclude that Abner was armed and dangerous. Second, Abner's actions did not amount to a furtive movement. Third, Abner's hands were initially visible to the officers as he walked to the vehicle and the only thing he was carrying was a Walgreen's bag. Nothing was observed that was suspicious or indiscernible.

{¶ 19} In this case, the officers, by their own testimony, were simply investigating a parking violation when they asked the men to talk to them. Both officers testified that the parking lot was known as a high-crime area, and the manner in which the truck was parked aroused their suspicions. Gustwiller testified that it was the location of the truck within the parking lot that caused him to be concerned:

{¶ 20} "Q: Okay. Officer I want to go back just for a second, too -- this specific parking spot --

{¶ 21} "A: Yes, sir.

{¶ 22} "Q: -- where is it in relation to the front door of this Walgreen's?

{¶ 23} "A: This specific one is closer to the back of the Walgreen's.

{¶ 24} "Q: Based on your experience, did that cause you any concern?

{¶ 25} "A: Yes, sir. Just due to the fact that it's parked away from the general entrance which most folks park up close to the entrance way -- yes, sir."

{¶ 26} Dedrick testified as to his experience with drugs in that parking lot: "We found that the outer portions of the parking spaces around behind the Walgreen's is most often where we see the individuals that come to purchase the drugs park. They park there and wait for phone calls to be directed out into the neighborhood where they further meet the dealers." However, Dedrick had previously testified that the truck was not parked behind the Walgreen's, but was "just a couple of parking spaces in from the entrance and exit." Furthermore, on cross-examination Dedrick was asked to mark the spot on defendant's Exhibit B where the truck was parked, and the spot he marked clearly shows that the vehicle was parked in a parking space that fronted Salem Avenue and not in the parking spaces located behind the Walgreen's, which would have been a greater distance away. We note that the trial court did not find that the truck was parked behind the store, but instead found that the truck was not parked in one of the spots that would have been "handier" for entering the store.

{¶ 27} Additionally, given the circumstances, there is no evidence that the officers

should have been concerned for their safety. Gustwiller initially testified on cross-examination that appellant had been required to respond to him because of the officer's safety concerns in investigating a parking violation. However, he later contradicted himself and acknowledged that Abner was free to walk away.

{¶ 28} "Q: And at that point, they're under no obligation to come over to you; are they?

{¶ 29} "A: Yes, sir, because we are investigating a parking violation.

{¶ 30} "Q: You were investigating a parking violation so you got to talk to everybody?

{¶ 31} "A: Yes, sir, for our safety -- yes sir.

{¶ 32} "Q: It was plain that he wanted nothing to do with you.

{¶ 33} "A: That is correct, sir.

{¶ 34} "Q: Okay. Nevertheless, you decide you're going to approach him.

{¶ 35} "A: Yes, sir, for my safety."

{¶ 36} However, Gustwiller later admitted that appellant was really under no obligation to speak to either officer, and had the right to walk away from the officers if he chose to:

{¶ 37} "Q: Well, you told him -- you said he had an obligation to come over when he was summoned.

{¶ 38} "A: Yes, sir, so we could continue our investigation and talk why they were parked that way.

{¶ 39} "Q: He doesn't have any obligation to answer any questions; correct?

{¶ 40} "A: We wanted to talk to him -- yes, sir.

{¶ 41} "Q: I understand you wanted to but he's under no obligation to comply with your desire; is he?

{¶ 42} "A: No, sir.

{¶ 43} "Q: All right. Thank you. And he's not, at that point, even obligated to say anything to you; correct?

{¶ 44} "A: Yes, sir."

{¶ 45} This court cannot conclude that Abner's failure to comply with a request that the officer acknowledged Abner was not obligated to comply with can justify the officers' leap to the conclusion that their safety was in jeopardy. Gustwiller repeatedly testified that he was investigating only a parking violation, which is not an inherently threatening situation.

{¶ 46} Gustwiller further testified that it was the failure of Abner to show his hands upon request that was cause for concern:

{¶ 47} "Q: Okay. And what, if anything, did you see him do with those hands?

{¶ 48} "A: Both his hands, as soon as he had the door open, he stuck both his hands inside the cab where I was unable to see them.

{¶ 49} "Q: And when he did that, did you say anything to him?

{¶ 50} "A: Officer Dedrick told him to show his hands.

{¶ 51} "Q: Okay. And did he show his hands?

{¶ 52} "A: No, sir, he did not.

{¶ 53} "Q: Did that cause you concern?

{¶ 54} "A: Yes, sir."

{¶ 55} However, on the direct examination of Officer Dedrick, no testimony was offered regarding Abner's failure to show his hands upon request:

{¶ 56} "Q: Okay. So after the person that was going to the passenger side did not comply, what did you do?

{¶ 57} "A: I just took note of him. As the driver walked toward me, Officer Gustwiller noticed also that he wasn't listening when I was asking him to come over to my direction. Officer Gustwiller walked around the truck to meet him at the passenger door.

{¶ 58} "Q: Okay. Once Officer Gustwiller met that person at the door what, if anything, did you do with the person, the driver?

{¶ 59} "A: After seeing what Officer Gustwiller -- it was a short time he had begun placing the defendant in handcuffs after he had met him at the passenger door. Seeing that, I had Joshua Mullis sit down on the curb just somewhere outside our cruiser there where we were standing, just had him sit down on the sidewalk."

{¶ 60} There is no indication in the testimony by Dedrick that he had ever told Abner to show his hands, even though Gustwiller stated that it was Abner's failure to comply with Dedrick's request that justified his safety concerns. We note that this fact is absent from the trial court's analysis in overruling the motion to suppress. Also absent from the court's analysis is Gustwiller's testimony that establishes that any attempt by Abner to set the Walgreen's bag down in the cab of the truck or to enter the truck would have rendered the front portion of Abner's body not visible to Gustwiller, who approached Abner from behind and grabbed him.

{¶ 61} This case is distinguishable from *State v. Jarnigan*, 2009-Ohio-1640, in which we concluded that the defendant had in fact made a furtive gesture. In *Jarnigan*, the defendant was seen making a grinding motion with her right hand between her legs after failing to show officers her hands, a movement recognized as an attempt to conceal drugs. In this case, however, Abner merely opened the car door and placed his hands inside the cab of the truck. This movement alone does not amount to a furtive gesture. Abner was free to simply put the Walgreen's bag he was carrying onto the passenger seat. Abner was also free to climb into the passenger seat of the truck, since, as previously stated, he was under no obligation to speak to the police officers. On these facts, Abner's act of putting his hands into the truck cannot be construed as a furtive gesture, nor can his conduct lead to a reasonable conclusion that he was armed and dangerous.

{¶ 62} Furthermore, as we held in *Schooler*, 2004-Ohio-3578, even if Abner's actions could be considered a furtive gesture, this alone does not create a reasonable suspicion of danger or criminal activity and cannot justify the seizure of Abner. Even though the Phoenix Project is known as a high-crime area, a person's action must still create a reasonable suspicion of criminal or dangerous activity in order to justify a search, and such activity, simply does not exist in this case. Like in *Schooler*, without any more factors to consider, the alleged furtive gesture in this case does not warrant the officer's seizure of Abner. The so called "plain view" of the drugs in the front seat after Abner's unlawful seizure cannot be sanctioned, as it clearly is the fruit of the unlawful seizure of Abner's person in the first instance.

{¶ 63} For the foregoing reasons, this court finds that Abner was improperly seized

at the side of the truck, rendering any subsequent discovery of the drugs the fruit of an unlawful seizure. According to the officer's testimony, Abner was free to walk away and get in the truck while the officers investigated a parking matter, not a drug deal. Therefore, we hold that the trial court erred in denying the motion to suppress. The judgment is reversed, and this matter is remanded for further proceedings consistent with this opinion.

Judgment reversed,

and cause remanded.

. . . . . . . . . .

FAIN, J., concurs.

HALL, J., dissents.

HALL, Judge, dissenting.

{¶ 64} I agree that appellant, when walking to the passenger side of a vehicle parked awkwardly in the lot at a Walgreen's store, had no obligation to stop because there was an absence of any reasonable and articulable suspicion that he was engaged in criminal activity. His failure to stop does not, and cannot, be interpreted as additional suspicion in and of itself. Nevertheless, there is nothing improper about the officer's continuing to follow him. Then, the officer saw appellant place both hands inside the cab of the truck, not just the hand in which he was carrying a Walgreen's bag. Given the location, time, and circumstances, the officer's act of grabbing appellant by the shoulders and having him step aside, revealing heroin in plain view on the seat, was reasonable. I would agree with the trial court's conclusion that "the movement of reaching into the pickup under all these

circumstances rises to the level of a furtive movement, which * * * justified the immediate seizure of [appellant] for reasons of officer safety."  Therefore, I would affirm the denial of the motion to suppress.

. . . . . . . . . .