[Cite as *State v. Zafr*, 2019-Ohio-4602.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28434 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-985 |
| | : | |
| KEON PIERRE ZAFR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellant

CATHERINE H. BREAULT, Atty. Reg. No. 0098433 and JON PAUL RION, Atty. Reg. No. 0067020, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402
     Attorneys for Defendant-Appellee

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Plaintiff-appellant, the State of Ohio, appeals from the trial court's decision of June 5, 2019, in which the court sustained a motion to suppress filed by Defendant-appellee, Keon Pierre Zafr. In a single assignment of error, the State argues that the court erred by finding that law enforcement officers improperly detained Zafr without reasonable suspicion that he was engaged in criminal activity. We find that the court did not err, and its decision sustaining Zafr's motion to suppress is therefore affirmed.

## I. Facts and Procedural History

{¶ 2} A person identifying himself only by his first name contacted the Dayton Police Department by telephone on the evening on March 12, 2018, to report a man with a rifle in the parking lot of Summit Square Townhouses, near the entrance. Transcript of Proceedings, Ex. 1, May 3, 2019. The caller indicated only that the man "appear[ed] to have a rifle" and was wearing a hat and a light blue jacket. *See id.* Two officers responded to the report, arriving seven to eight minutes after the caller contacted the Dayton Police Department. *See id.* at Ex. 1.

{¶ 3} When the officers arrived, they asked their dispatcher to confirm with the caller that the man was still there. *Id.* at 10:10-11:4. The caller had since left the area but last saw the man "leaning against [a] car." *Id.*

{¶ 4} As the officers began searching the parking lot, they "[a]lmost immediately [noticed] a vehicle with three males inside of it." *Id.* at 11:13-11:20. Because the man "in the driver's seat was wearing a light colored jacket," and because the officers "didn't see anybody else in cars," they "decided to approach [the] vehicle." *Id.* Intending to initiate a consensual encounter, the officers did not activate their cruiser's lights or siren.

*See id.* at 12:3-12:19.

{¶ 5} The man in the driver's seat—later identified as Zafr—and one of the other male occupants exited the vehicle as the officers stopped their cruiser behind it.[1] *See id.* at 12:3-12:19 and 18:11-18:21. One of the officers told Zafr about the "gun complaint," but Zafr "[i]mmediately * * * start[ed] kind of backing away" and "looking around [as if he were] going to try to run" from the officer. *Id.* at 12:20-13:3.

{¶ 6} The officer then became concerned about the possibility that Zafr had a weapon hidden "in [or near] his waistline or in [his] pocket" because Zafr was "[l]ike reaching, like trying to hike up his pants." *See id.* at 14:12-14:24. Although Zafr "didn't take off running" as the officer "continue[d] to approach him," the officer "thought [his] safety or [that of his partner] could have been at risk" and was therefore "kind of nervous" *Id.* at 15:2-15:8. Believing that Zafr "was going to run," the officer "just tried to kind of hang onto him." *Id.*

{¶ 7} To address his concern about the possibility that Zafr was armed, the officer asked him for permission to perform a pat-down search. In response, Zafr said nothing but "again started kind of pulling away" from the officer, who reacted by "get[ting] both of [Zafr's] arms behind his back [and] away from his front pockets[,] because he kept trying to go to front pocket [sic]." *Id.* at 15:2-15:16.

{¶ 8} With Zafr handcuffed and secured, the officer looked "inside the [vehicle] and [saw] a [hand]gun in plain view." *Id.* at 16:8-16:19. A pat-down search of Zafr's person

---

[1] The vehicle actually held a total of four occupants: Zafr, two other males and a female child. *See* Transcript of Proceedings 11:13-11:20. Of these, the child and one of the males remained in the vehicle's rear seat until the officers had secured Zafr and the other male. *See id.* at 16:20-17:25.

resulted in the discovery of a cigarette box in one of the front pockets of his pants; allegedly, the box contained illegal drugs. *See id.* at 55:22-59:6. The officers did not find a rifle.[2] *Id.* at 37:13-37:14.

**{¶ 9}** On June 15, 2018, a Montgomery County grand jury issued a five-count indictment against Zafr, and on November 2, 2018, Zafr pleaded not guilty. Zafr filed a motion to suppress on December 4, 2018, in which he requested the suppression of all evidence obtained as a result of his detention and subsequent arrest on March 12, 2018. The trial court held a hearing on May 3, 2019, and in its decision of June 5, 2019, the court sustained the motion. On June 11, 2019, the State timely filed a notice of appeal pursuant to R.C. 2945.67.

## II. Analysis

**{¶ 10}** For its single assignment of error, the State contends that:

THE TRIAL COURT ERRED IN GRANTING ZAFR'S MOTION TO SUPPRESS. THE COURT INCORRECTLY RULED THAT THERE WAS NO REASONABLE AND ARTICULABLE SUSPICION OF CRIMINAL ACTIVITY THAT ALLOWED POLICE TO DETAIN ZAFR.

**{¶ 11}** The Fourth Amendment to the United States Constitution and Article 1, Section 14, Ohio Constitution prohibit unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also State v. Taylor*, 138 Ohio App.3d 139, 145, 740 N.E.2d 704 (2d Dist.2000). Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the "few specifically

---

[2] The officers apparently did not find a hat, either, though the record is not definitive in this respect.

established and well-delineated exceptions." (Citations omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of these exceptions "is commonly known as an investigative or *Terry* stop." (Citation omitted.) *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 17.

{¶ 12} In "*Terry* [*v. Ohio*], the United States Supreme Court held that a police officer may detain" a person "for brief questioning where the officer has a reasonable suspicion that the [person] is engaged in criminal activity." (Citation omitted.) *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997). Reasonable suspicion "is 'vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *Id.*, quoting *State v. Osborne*, 2d Dist. Montgomery No. 15151, 1995 WL 737913, *4 (Dec. 13, 1995). The "usual requirements of a warrant and probable cause are not implicated by [a *Terry* stop] because an investigatory detention is less intrusive than a formal custodial arrest." *Id.*

{¶ 13} Appellate review of a trial court's ruling on "a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Because the trial court is "in the best position" to weigh evidence in general, and to evaluate the credibility of witnesses' testimony in particular, an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *See id.* Accepting the trial court's findings of fact as true, "the appellate court must then independently determine," without deference to the trial court's ultimate holding, "whether the "facts satisfy the applicable * * * standard." (Citation omitted.) *See id.* The applicable standard in this case is

reasonable suspicion, which entails an evaluation of the totality of the circumstances from the perspective of a "reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991); *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14.

{¶ 14} According to the State, the police officers who responded to Summit Square Townhouses on March 12, 2018, had "a reasonable and articulable suspicion that Zafr had [been engaging] or was about to engage in criminal activity" because "Zafr * * * look[ed] nervous, backed away from [the police officer who was approaching him] and kept 'hiking up' his pants." Appellant's Brief 5-6. Claiming that "[t]hese factors alone" sufficed to justify the officers' *Terry* stop of Zafr, the State adds that "when [the officers] arrived * * *, there was only one car in the parking lot that had any people in it or around it"; that Zafr exited his vehicle as the officers stopped their cruiser behind it; that "Zafr [was] wearing a light blue jacket"; that "the incident took place in a high crime area"; and that "the call involved a firearm." *Id.* at 6. The State likens the instant matter to the case underlying our opinion in *State v. Johnson*, 2d Dist. Miami No. 2012 CA 22, 2013-Ohio-4729.[3]

{¶ 15} In *Johnson*, however, we noted that a *Terry* stop is not justified "merely [because a person] change[s] [his] mind about talking to an officer, walk[s] away, or act[s] in an 'unusual' fashion." *Johnson* at ¶ 20; *see also, e.g., State v. Abner*, 194 Ohio App.3d 523, 2011-Ohio-4007, 957 N.E.2d 72, ¶ 12 (2d Dist.). Thus, Zafr's nervousness and reluctance to speak to the officer who approached him were not independently sufficient

---

[3] The State inaccurately indicates that the *Johnson* case originated in Montgomery County and incorrectly lists the citation as "2013-Ohio-4739." Appellant's Brief 6.

to justify a *Terry* stop. Additionally, though the call involved a firearm at a location in "kind of a rough area," a rifle would nevertheless have been difficult to conceal. Transcript of Proceedings 7:7-7:13.

{¶ 16} Moreover, the facts in *Johnson* are dissimilar to the facts in the present case. An officer with the Troy Police Department initiated a consensual encounter with Johnson as part of an investigation into an automobile accident and assault that Johnson might have witnessed, as well as an allegation that Johnson himself had committed domestic violence. *Johnson* at ¶ 4-8. The officer was personally familiar with Johnson from previous interactions. *Id.*

{¶ 17} Johnson momentarily consented to speak to the officer, but "he almost immediately began to back away [and] then claimed [that] he had to go to his apartment" before continuing the conversation. *Id.* at ¶ 8. The officer found Johnson to be " 'more hesitant' " than he had seemed on past occasions, and because he was " 'doing something in his waistband area' " or in the pocket of his sweatshirt, the officer " 'knew things were going bad at that point.' " *Id.* After requesting assistance, the officer forcibly detained Johnson, leading to the discovery of a stolen gun on Johnson's person. *Id.* at ¶ 9. Johnson was eventually convicted of several offenses. *Id.* at ¶ 12.

{¶ 18} Having unsuccessfully moved for the suppression of the evidence "obtained as a result of his detention and 'subsequent pat[-]down,' " Johnson argued on appeal that the trial court should have ordered that the evidence be suppressed because the officer did not detain him based on reasonable suspicion. *See id.* at ¶ 14. We found, "under the circumstances presented, * * * that the officer was justified in detaining Johnson for further investigation." *Id.* at 20.

{¶ 19} Presumably, the State draws a comparison between *Johnson* and the instant case because we remarked in *Johnson* that the "trial court reasonably concluded that Johnson's manner of backing away from the officer, which included trying to remove something from his waistband and * * * fail[ing] to comply with the officer's request that he stop [and] show his hands, justified the officer's concern that Johnson [might] pose a danger." *Id.* at ¶ 19. The foregoing remark must, however, be construed "<u>under the circumstances presented</u>." (Emphasis added.) *Id.* at ¶ 20.

{¶ 20} We agreed with the trial court's conclusion largely on the basis of the officer's familiarity with Johnson. *See id.* at ¶ 5-8 and 17-20. Generally, a law enforcement officer would not have sufficient reason to escalate a consensual encounter with a person into a *Terry* stop merely because the person appears nervous or walks away, but the officer's " 'pretty good rapport' " with Johnson in the past provided reference points for a comparative assessment. *See id.* at ¶ 7. That is, in light of his past interactions with Johnson, the officer had sufficient experience with Johnson's demeanor to support a reasonable suspicion that Johnson's hesitancy to speak with him was indicative of a possible threat.

{¶ 21} Here, by contrast, the Dayton Police Department officers had no previous experience with Zafr, who could have been nervous or uncomfortable for a variety of reasons, but whatever his reasons, he had no obligation to speak with them. The officers, furthermore, did not respond to Summit Square Townhouses to investigate criminal conduct—even assuming for sake of analysis that Zafr had been walking in the parking lot with a rifle, he would not have been violating the law.[4] At the time the officers

---

[4] Consequently, the State's argument about the reliability of the telephone tip to which

restrained Zafr, they therefore had no reason to believe that he was engaged in criminal activity or was about to engage in criminal activity.

{¶ 22} The State also argues that irrespective of whether the officers' detention of Zafr was initially justified, "[o]nce [he] began to flee, the officers had probable cause to arrest [him]" for obstructing official business. *See* Appellant's Brief 10. In support of this assertion, the State cites to our opinion in *State v. Lewis*, 2d Dist. Montgomery No. 27152, 2017-Ohio-1195. As the State notes, we found that Lewis, the defendant-appellant, "was not entitled to respond [to an unlawful pat-down search] by fleeing on foot and forcing the officer to chase him." *Lewis* at ¶ 12. The officer in that case, however, had already executed a lawful traffic stop "based on [his] observation of apparent traffic violations" committed by Lewis. *See id.* In the instant case, the officers had not already executed a lawful *Terry* stop, meaning that Zafr had the right to walk away.

### III. Conclusion

{¶ 23} We find that Zafr was unlawfully detained in the absence of a reasonable suspicion that he was engaged or about to engage in criminal activity. The State's assignment of error is overruled, and the trial court's decision of June 5, 2019, sustaining Zafr's motion to suppress is therefore affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and DONOVAN, J., concur.

---

the officers were responding is irrelevant. Appellant's Brief 7-9. Even if the caller had identified himself by his full name, and even if the information he provided was entirely accurate, the information did not provide a basis for a lawful *Terry* stop.

Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
Catherine H. Breault
Jon Paul Rion
Hon. Richard Skelton