[Cite as *State v. Deckard*, 2023-Ohio-1398.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29611 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 04088 |
| | : | |
| JASON NEVADA DECKARD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 28, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

THERESA G. HAIRE, Attorney for Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Jason Nevada Deckard appeals from his conviction following a no-contest plea to one count of aggravated drug possession.

{¶ 2} Deckard contends the trial court erred in overruling his motion to suppress drugs found in his possession after University of Dayton police officers unlawfully

detained him in a university-owned parking lot. He argues that the officers lacked reasonable, articulable suspicion of criminal activity and that they unlawfully prolonged his detention after resolving their initial reason for the stop.

{¶ 3} We agree with Deckard that the officers lacked particularized suspicion of criminal activity to justify an investigatory stop. As a result, the trial court erred in failing to sustain his suppression motion. The trial court's judgment will be reversed, and the case will be remanded for further proceedings.

### I. Background

{¶ 4} A grand jury indicted Deckard on charges of aggravated drug possession, possession of a fentanyl-related compound, and possession of cocaine. The first charge was a third-degree felony. The other two were fifth-degree felonies. The charges stemmed from Deckard's being stopped by University of Dayton police officers around 2:30 a.m. on Friday, August 6, 2021, as he walked across a university-owned parking lot carrying a guitar.

{¶ 5} Following his indictment, Deckard moved to suppress the drug evidence, arguing that the officers had lacked grounds for an investigatory stop. The matter proceeded to a June 24, 2022 evidentiary hearing. The only witnesses were University of Dayton police officers Jonathan Pease and Kelvin Buerkle.

{¶ 6} Officer Pease testified that he saw Deckard walking in an area of university-owned housing between Woodland Cemetery and Brown Street. Although summer school was in session, there was little pedestrian traffic at that time. Pease watched Deckard walk through an alley and cut across a university-owned parking lot. Deckard

appeared to be older than a typical student. He also was carrying a guitar, which Pease thought "seemed a little odd and out of place at the time." Pease wondered where the guitar "might have come from."

{¶ 7} Pease and another officer got into one cruiser while Officer Buerkle and a sergeant entered a second cruiser. The officers then approached Deckard and detained him. Pease explained that the officers had obtained his identifying information and used it to check for warrants. Pease also checked to see if Deckard had been "trespassed from the university." With regard to potential criminal activity, Pease stated on direct examination that "technically once [Deckard] got into our lot it would be trespassing, you know, if he's not a student or has any legitimate business to be there." Pease agreed with the prosecutor's assessment that "other than potentially possibly trespassing," Deckard was not seen engaging in criminal activity.

{¶ 8} While speaking with Deckard, one of the officers ordered him to put down the guitar. When Deckard complied, the officers were able to see the top of a syringe sticking out of his pants pocket. One of the officers conducted a pat down in connection with retrieving the needle. As he did so, he discovered a second needle, drugs, and a crack pipe in Deckard's pocket. A dispatcher reported that Deckard had arrest warrants out of Beavercreek and Kettering. As a result, he was handcuffed and arrested.

{¶ 9} When asked on cross-examination about the purpose of the stop, Pease explained that it was "[a]n investigative stop just to see why he was in the area." Pease acknowledged, however, that it was "not illegal" for Deckard to be "in that area." Pease also agreed that the parking lot was "a natural shortcut to the [United Dairy Farmers store]

on Brown Street," which was open 24 hours a day. Finally, Pease acknowledged that the syringe would not have been visible if Deckard had not been ordered to put the guitar down.

{¶ 10} In his testimony, Officer Buerkle stated that there had been "a large amount of burglaries" in the area. He was concerned because Deckard looked "out of place." Buerkle stopped Deckard in parking lot RP14, which was the University of Dayton's private property. Buerkle testified that the parking lot had signs identifying it as university property. According to Buerkle, the officers prevented Deckard from walking away while they were trying to identify him. Explaining why Deckard was not free to leave, Buerkle stated: "I am trying to investigate who they are and probable cause based off of suspicion that he may have committed a crime. I'm going to figure out who he was." Buerkle agreed with the prosecutor's suggestion that it was important to see whether "they have been trespassed from UD property previously."

{¶ 11} On cross-examination, Buerkle reaffirmed his belief that Deckard seemed "out of place" walking through the parking lot carrying a guitar. Buerkle admitted that he had "no idea" at the time of the stop whether Deckard had been involved in any criminal activity. When asked whether it was "unlawful to cut through that parking lot to get to the stores on Brown Street," Buerkle responded, "No." Buerkle conceded that when he prevented Deckard from walking away he still "had no specific indication of criminal conduct[.]" Buerkle agreed that the reason for the stop was "just that he was out of place." Buerkle also confirmed that during the stop Deckard produced a receipt proving he had purchased the guitar. With regard to the signs in the parking lot, Buerkle clarified that they

identified the lot as university property but did not tell non-faculty or non-students to keep out.

{¶ 12} Based on the evidence presented, the trial court filed a July 29, 2022 Decision, Entry, and Order overruling Deckard's suppression motion. With regard to the officers stopping and detaining Deckard, the trial court reasoned:

This Court agrees with the notion that merely walking around with a guitar at 2:00 a.m. does not solely lend itself to being reasonably suspicious, [but] that is not where the analysis ends in this case. ["]In certain circumstances wholly, lawful conduct may justify an officer's suspicion that criminal activity is afoot. . . . Moreover, circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement personnel, and in determining whether reasonable suspicion exists, law enforcement authorities may assess these circumstances in light of their experience." (citations omitted). *State v. Wilkins*, 1998 Ohio App. LEXIS 2740, (Ohio 2nd Dist. Ct. of Appeals, June 19, 1988), 1998 WL 320940. * * *

When viewed under the totality of circumstances, Defendant was observed looking out of place on University of Dayton private property and multiple signage was displayed to indicate as such. Ofc. Pease's duties include making sure no one is getting into buildings which were either U.D. owned or landlord properties. Not only was it 2:00 a.m., there were no students on campus due to it being summer break. A majority of the foot

traffic in that area occurs on Brown Street and very little foot traffic occurs in the neighborhood where Defendant was stopped, especially during that time at night and time of year. Additionally, Ofc. Buerkle testified to there having been a large amount of burglaries and thefts in that area. U.D. officers likely have a duty to maintain the safety of the residents and potential students who may be in the area or are located still on campus. No criminal activity was observed by the officers except for him being on private UD property. The Court finds the officers did not lack the authority to conduct a brief investigatory stop.

**{¶ 13}** Following the trial court's ruling, Deckard pled no contest to aggravated drug possession in exchange for dismissal of the other charges. The trial court accepted the plea, made a finding of guilt, and sentenced him to community-control sanctions.

## II. Analysis

**{¶ 14}** In his sole assignment of error, Deckard challenges the trial court's suppression ruling. His primary argument is that the University of Dayton police officers lacked reasonable, articulable suspicion of criminal activity to justify stopping him. He also asserts that the officers unlawfully prolonged his detention after discovering that he had a receipt for the guitar.

**{¶ 15}** In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Accordingly, when we review suppression decisions, we must accept

the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 16} Here the facts underlying Deckard's suppression motion were relatively straightforward. The only witnesses at the hearing were Officers Pease and Buerkle, who both testified for the State. There were no real factual disputes to resolve or credibility decisions for the trial court to make. The primary issue on appeal involves a legal determination: whether the officers' testimony supported a finding that they were justified in detaining Deckard.

{¶ 17} The Fourth Amendment to the United States Constitution and Article 1, Section 14, Ohio Constitution prohibit unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also State v. Taylor*, 138 Ohio App.3d 139, 145, 740 N.E.2d 704 (2d Dist.2000). Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the "few specifically established and well-delineated exceptions." (Citations omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One exception "is commonly known as an investigative or *Terry* stop." (Citation omitted.) *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 17.

{¶ 18} "In *Terry*, the United States Supreme Court held that a police officer may detain a person for brief questioning where the officer has a reasonable suspicion that the [person] is engaged in criminal activity." (Citation omitted.) *State v. Shepherd*, 122

Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997). Reasonable suspicion "is 'vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *Id.*, quoting *State v. Osborne*, 2d Dist. Montgomery No. 15151, 1995 WL 737913, *4 (Dec. 13, 1995). Assessing the existence of reasonable suspicion for an investigatory stop "entails an evaluation of the totality of the circumstances from the perspective of a 'reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Zafr*, 2d Dist. Montgomery No. 28434, 2019-Ohio-4602, ¶ 13, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). As the trial court recognized, a series of "innocent" acts viewed collectively may justify an officer's suspicion that criminal activity is afoot and warrant an investigatory detention. *State v. Brown*, 2d Dist. Montgomery No. 19804, 2003-Ohio-6533, ¶ 36.

{¶ 19} In the present case, however, we see no indicia of criminal activity by Deckard to justify an investigatory detention. Nor does the record reflect a series of innocent acts or lawful conduct that reasonably might have caused the University of Dayton police officers to believe Deckard was about to engage in criminal activity or that he had just done so. The officers' attention was drawn to Deckard because he was cutting across a university-owned parking lot in the early morning hours carrying a guitar. He appeared to be older than a traditional student and was in the vicinity of university-owned housing while heading toward Brown Street and an open convenience store.

{¶ 20} Even accepting Buerkle's testimony about burglaries having been committed in the general area, the foregoing facts were insufficient to create reasonable

suspicion that Deckard was involved in criminal activity. Buerkle testified that the reason for the stop was that Deckard seemed "out of place" in the parking lot. Again, the articulable facts supporting that assessment were that Deckard, who appeared to be older than a typical student, was near university-owned housing carrying a guitar in the early-morning hours. The officers acknowledged, however, that his route was a natural shortcut to an open convenience store on Brown Street. (In fact, Deckard later told the officers that he had been heading to the United Dairy Farmers store to purchase coffee.) Nevertheless, when he initially saw Deckard, Pease thought his carrying a guitar "seemed a little odd and out of place at the time," causing the officer to wonder where the guitar "might have come from."

{¶ 21} Although Deckard's act of walking toward an open convenience store carrying a guitar in the vicinity of university-owned housing may have been odd, it did not give rise to a reasonable suspicion of criminal activity. Buerkle did not suggest otherwise at the suppression hearing. The officer admitted detaining Deckard despite having "no idea" whether he had been involved in any criminal activity. When he subsequently prevented Deckard from walking away, Buerkle still "had no specific indication of criminal conduct." Under these circumstances, the record compels a finding that the officers possessed no more than an inchoate suspicion or hunch that Deckard may have been doing something illegal.

{¶ 22} In reaching our conclusion, we recognize that the act of trespassing itself can be a crime and that an officer's reasonable, articulable suspicion that a person has committed criminal trespass may justify a *Terry* stop. In *Brown*, 2d Dist. Montgomery No.

19804, 2003-Ohio-6533, upon which the trial court relied, we found a *Terry* stop warranted where police observed a suspect walking slowly and cutting through a residential yard in the middle of the night. As he walked, the suspect repeatedly looked over his shoulder and turned his body to look back. This court held that officers possessed reasonable, articulable suspicion that the suspect was committing criminal trespass and may have been preparing to break into a house. *Id.* at ¶ 37-43.

{¶ 23} We find *Brown* to be distinguishable. Although Deckard was in the vicinity of university-owned student housing, neither officer testified that he was near a particular house or that he was behaving suspiciously while apparently trespassing on a residential lawn. The officers simply observed him walking across an unfenced, open, university-owned parking lot.

{¶ 24} Ohio's criminal-trespass statute provides:

(A) No person, without privilege to do so, shall do any of the following:

(1) Knowingly enter or remain on the land or premises of another;

(2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard;

(3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of

potential intruders, or by fencing or other enclosure manifestly designed to restrict access;

(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either;

5) Knowingly enter or remain on a critical infrastructure facility.

{¶ 25} Under the specified circumstances, the criminal-trespass statute prohibits either knowingly or recklessly entering or remaining on the land or premises of another "without privilege." The Revised Code defines "privilege" as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). The term "privilege" is "broader than permission as such." *See* Legislative Service Commission notes following R.C. 2901.01.

{¶ 26} Here the only possible provision Deckard could have violated is the general prohibition in R.C. 2911.21(A)(1). Subsection (A)(2) would not apply because use of the parking lot was not clearly restricted to certain persons, purposes, modes, or hours. Although the parking lot had signs identifying it as private property, Deckard did not attempt to park a vehicle there. The signs on the lot did not prohibit the general public from walking across the lot, and they were not "no trespassing" signs. Subsection (A)(3) would not apply because there was no fencing and no posted notice prohibiting unauthorized access or presence. Subsection (A)(4) would not apply because Deckard

did not fail to leave after being notified to do so. Finally, subsection (A)(5) would not apply because the parking lot was not "a critical infrastructure facility," which is specifically defined in R.C. 2911.21(F)(4).

{¶ 27} With regard to R.C. 2911.21(A)(1), Deckard did knowingly enter on the land of another when he cut across the university-owned parking lot. The record before us, however, does not suggest that he did so "without privilege." To the contrary, the record indicates that Deckard had a right to walk across the lot arising from an implied grant of permission. Officer Buerkle notably testified that it was "not unlawful" for Deckard to cut across the parking lot. Officer Pease similarly acknowledged that it was "not illegal" for Deckard to be "in that area." The only reasonable inference to draw from this testimony is that the University of Dayton did not care if pedestrians walked across its open parking lot, meaning that such activity was "privileged."

{¶ 28} The foregoing conclusion is buttressed by both officers' concern about whether Deckard had been "trespassed" from University of Dayton property. In a legal sense, being "trespassed" means a person's permission to be in a particular area has been revoked. *See*, *e.g.*, *State v. Roark*, 2d Dist. Montgomery No. 23559, 2010-Ohio-2841, ¶ 14 ("In this case police had a reasonable suspicion that Defendant was trespassing on DMHA property. Officer Wolpert knew Defendant was on the DMHA trespass list because, just four months earlier, Wolpert had personally trespassed Defendant off of all DMHA property for carrying concealed weapons."); *State v. Scott*, 2d Dist. Montgomery No. 19902, 2004-Ohio-271, ¶ 19 ("We emphasize that Fletcher was aware of the DMHA criminal trespass policy and of the fact that Scott had been given

trespass notices, thus barring him from DMHA property, pursuant to that policy."); *State v. McLemore*, 2d Dist. Montgomery No. 24211, 2011-Ohio-243, ¶ 4 (noting that officers found a field-interview card stating the defendant had "been 'trespassed' from a BP station, meaning he had been informed that he was no longer allowed on the property"); *Gessner v. Vore*, 2d Dist. Montgomery No. 22297, 2008-Ohio-3870, ¶ 6 (citing a "trespass notice" advising an individual "that he was no longer authorized to enter and/or remain on the premises").

{¶ 29} Of course, for permission to be revoked pursuant to a trespass notice, permission to be present must exist in the first instance. For example, in *State v. Carman*, 2d Dist. Montgomery No. 18050, 2001 WL 85788 (Feb. 2, 2001), a University of Dayton graduate received a trespass notice advising her that her existing "privilege to enter onto the property of the University of Dayton had been revoked." *Id.* at *1. Similarly, in *City of Akron v. Niepsuj*, 9th Dist. Summit No. 21369, 2003-Ohio-6581, the defendant was prosecuted for criminal trespass on University of Akron property after receiving a trespass notice that prohibited him from being on the premises. In that case, an officer testified that everyone was welcome on University of Akron property unless they had caused a disturbance and received a trespass notice. Although the University of Dayton is a private school, the testimony of Officer Buerkle and the particular concerns expressed by both Buerkle and Pease about whether Deckard had been "trespassed" indicated that the University of Dayton had a similar open-access policy with respect to unrestricted areas, particularly its parking lots.

{¶ 30} We recognize that Officer Pease at one point did reference Deckard

"technically" trespassing in the parking lot. Reading the suppression-hearing transcript as a whole, however, we are compelled to conclude that both officers knew cutting across the lot would be trespassing only if Deckard previously had been banned from university property by being "trespassed." Relying solely on Pease's statement about "technically" trespassing to find that the officers had reasonable suspicion of criminal activity would require us to ignore (1) both officers' expressed concern about whether Deckard in fact had been "trespassed" from university property, (2) Pease's recognition that it was "not illegal" for Deckard to be "in that area," and (3) Buerkle's unequivocal testimony that it was "not unlawful" for Deckard to cut across the parking lot.

{¶ 31} Based on the reasoning set forth above, we hold that the University of Dayton police officers lacked reasonable, articulable suspicion of criminal activity to justify stopping Deckard in the parking lot. In light of that determination, we need not address Deckard's alternative argument about the officers prolonging the stop after discovering that he had purchased the guitar he was carrying.

{¶ 32} Deckard's assignment of error is sustained.

### III. Conclusion

{¶ 33} The judgment of the Montgomery County Common Pleas Court is reversed, and the case is remanded for further proceedings.

. . . . . . . . . . . . .


LEWIS, J. and HUFFMAN, J., concur.